UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  Plaintiff,

v.

GHISLAINE MAXWELL,   Defendant

Case No. 20-CR-330 (AJN)

PETITION FOR WRIT OF HABEAS CORPUS PURSUANT

TO 28 U.S.C. § 2255

CASES

i

Arizona v. Youngblood, 488 U.S. 51 (1988 ...................................................................i

Banks v. Dretke, 540 U.S. 668, 696 (2004 ..................................................................i

Bell v. Wolfish, 441 U.S 520, 535, 539, 99 S. Ct. 1861,60 L. Ed. 2d 447 (1979 .................i

Berger v. United States, 295 U.S. 78, 88 (1935 ..........................................................i

Brady v. Maryland, 373 U.S. 83 (1963 .........................................................................i

*Brady v. Maryland*, 373 U.S. 83, 87 (1963 .................................................................i

Bravo, 808 F. Supp. at 320 n.10 ...................................................................................i

California v. Trombetta, 467 U.S. 479 (1984 ...............................................................i

Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co., 152 F. Supp. 3d 159, 165 .............i

Daniels v. Williams, 474 U.S. 327, 331 (1986 ..............................................................i

Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986 .....................................................i

Dyer v Calderon, 151 F3d 970,983 (9th Cir 1998)(en banc .......................................i

Fed. R. Evid. 403 ............................................................................................................i

Fifth Amendment  U.S. Const. amend. V .....................................................................i

Fullwood v. Lee, 290 F.3d 663, 678 (4th Cir. 2002 .....................................................i

Giglio v. United States, 405 U.S. 150 (1972 ................................................................i

Giglio v. United States, 405 U.S. 150, 153–55 (1972 ..................................................i

Giglio v. United States, 405 U.S. 150, 154–55 (1972 ..................................................i

Gomez v. United States, 87 F.4th 100, 106 (2d Cir. 2023 ..........................................i

Harvey, 791 F.2d at 300 ...............................................................................................i

Hughey v. U.S, 495 U.S 411 (1990 ...............................................................................i

Hughey v. US, 495 U.S. 411 (1990 ...............................................................................i

Kassis v. United States, 3 F.4th 556, 564 (2d Cir. 2021). ...........................................i

Kopskin 757 F.3d 168, 172 (2dCir. 2014 .....................................................................i

Kyles v. Whitley, 514 U.S. 419 (1995) ..........................................................................i

Kyles v. Whitley, 514 U.S. 419, 437–38 (1995 ............................................................i

Kyles, 514 U.S. at 436–37 .............................................................................................i

Lovasco, 431 US at 795 n. 17 ................................................................... i

McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984 ........................... i

Mooney v. Holohan, 294 U.S. 103 (1935................................................................. i

Mooney v. Holohan, 294 U.S. 103 (1935);............................................................... i

Napue v. Illinois ...................................................................................... i

Napue v. Illinois, 360 U.S. 264 (1959 ............................................................... i

Napue, 360 U.S. at 269............................................................................... i

Pena-Rodriguez v. Colorado, 580 U.S. 206 (2017......................................................... i

Publicola v. Lomenzo, 54 F.4th 108, 111 (2d Cir. 2022 ................................................. i

Santobello v. New York, 404 U.S. 257, 262 (1971 ..................................................... i

Santobello, 404 U.S. at 262 .......................................................................... i

Smith v. Phillips, 455 U.S. 209, 217 (1982 .......................................................... i

Stirone v. United States, 361 U.S. 212 , 217 (1960 ................................................... i

Stirone v. United States, 361 U.S. 212 (1960 ........................................................ i

Strickler v. Greene, 527 U.S. 263 (1999 ............................................................. i

Strickler v. Greene, 527 U.S. 263 (1999) ............................................................ i

The Crime Victims' Rights Act, 18 U.S.C. § 3771....................................................... i

Torres v US 128 F3d 38,43 (2d Cir 1997................................................................ i

Townsend v. Burke, 334 U.S. 736 (1948............................................................... i

U.S v. Rodriquez, 492 F. Supp 3d 306, 311 (SDNY 2020.................................................. i

Under Brady v. Maryland, 373 U.S. 83 (1963 .......................................................... i

United States of America, Appellee, v. Fadi Alameh, Defendant-appellant, 341 F.3d
    167 (2d Cir. 2003.............................................................................. i

United States v. Agurs, 427 U.S. 97, 103 (1976)...................................................... i

United States v. Agurs, 427 U.S. 97, 107 (1976....................................................... i

United States v. Annabi, 771 F.2d 670, 672 (2d Cir. 1985 ............................................ i

United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998........................................... i

United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995 ................................................. i

United States v. Carter, 454 F.2d 426, 427 (4th Cir. 1972) .......................................... i

United States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012 ............................................... i

United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986.........................................i

United States v. Kahn, 472 F.2d 272, 287 (2d Cir. 1973) ..........................................i

United States v. Miller, 471 U.S. 130 (1985 ................................................................i

United States v. Nelson, 277 F.3d 164, 201 (2d Cir. 2002..........................................i

United States v. Orena, 145 F.3d 551, 557 (2d Cir. 199 .............................................i

United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998 ...........................................i

United States v. Parisi, 529 F.3d 134, 139 (2d Cir. 2008 ...........................................i

United States v. Pollack, 91 F.3d 331, 334 (2d Cir. 1996...........................................i

United States v. Rigas, 583 F.3d 108, 125 (2d Cir. 2009)...........................................i

United States v. Stein, 541 F.3d 130, 151 (2d Cir. 2008.............................................i

United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006.........................................i

United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996.................................i

US v Butler 955 F.3d 1052, 1053 (D.C. Cir. 2020 ......................................................i

US v Ausby, 916 F 3d 1089,1092 (DC Cir 2019 .........................................................i

US v Berrios 501 F2d 1207, 1211 (2d Cir. 1974 .........................................................i

US v Bravo *United States v. Bravo, 808 F. Supp. 311 (S.D.N.Y. 1992* .....................i

US v Marion, 404 US 307 (1971)..................................................................................i

US v. Gigante, 94 F. 3d 53 (2 Cir. 1996........................................................................i

US v. Gigante, 94 F.3d 53 (2d Cir. 1996.......................................................................i

US v. Salameh 152 F3d, 120 (2d Cir.1998....................................................................i

Wade v Mantello, 33 F3d. 51, 58-59 (2d Cir.2003.......................................................i

Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 7B7, 807 (1987.....................i

Young, 481 U.S. at 807 ..................................................................................................i

Statutes

U.S. Const. amend. VI,.................................................................................................i

    i

§ 2255..........................................................................................................................i

§2255............................................................................................................................i

28 U.S.C. § 2255 ..........................................................................................................i

U.S. Const. amend. V i

U.S. Const. amend. V, cl. 1    i

U.S. Const. amend. VI        i

EXHIBITS

1    DOCKET 645; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

2    DOCKET 653; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

3    BOOK by Lucia Osborne-Crowley (LOC) "LASTING HARM: Witnessing the Trial of Ghislaine Maxwell" 2025

4    THE KICKER PODCAST with Lucia Osborne-Crowley 2022

5    INDEPENDENT JAN 4, 2022 Ghislaine Maxwell Juror Breaks Silence

6    OBJECTIONS PODCAST- Host Adam Klasfeld interviews Lucia Osborne-Crowley Jan 11 2022.

7    PARAMOUNT PLUS – GHISLAINE: PARTNER IN CRIME-DOCUMENTARY

8    INDEPENDENT FEB 4, 2024 Lucia Osborne-Crowley, My Part in Triggering GHISLAINES APPEAL

9    DOCKET 613; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

10   TRANSCRIPT 1088 , PARKINSON at TRIAL United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

11   TRANSCRIPT GRAND JURY PARKINSON WEDNESDAY JULY 19 2006

12   TRANSCRIPT CAROLYN testifying to location of massage table; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)1521-22

13   TRANSCRIPT ALESSI; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

14   BRAD EDWARDS BOOK, Relentless Pursuit, My Fight for the Victims of Jeffrey Epstein.

15   JULIE K BROWN BOOK, Perversion of Justice: The Jeffrey Epstein Story

16   DOCKET 285; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

17   3501.226-072

18   DOCKET 285 p.16, p. 2/3 ▓▓▓▓ handwritten notes

19   Interesting Lawyers Podcast (ILP) (ADLER) PART 3 WITH BRAD EDWARDS

20   DOCKET 204; United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

21    DOC 1335-3  1.9.24 CASE 1:15 07433-LAP DEPOSITION OF GIUFFRE IN J
      EDWARDS PAUL CASSELL v ALAN M DERSHOWITZ

22    DOCKET 285-2; United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

23    DOCKET 204-6; United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

24    DOCKET 285-1; United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

25    BILL BARR TESTIMONY; Monday, August 18, 2025 COMMITTEE ON
      OVERSIGHT 5 AND GOVERNMENT REFORM, U.S. HOUSE OF
      REPRESENTATIVES, WASHINGTON, D.C. DEPOSITION OF: WILLIAM P.
      BARR

26    UUSTALL PODCAST 2022- WITH BRAD EDWARDS

27    NETFLIX: *GHISLAINE MAXWELL: FILTHY RICH*

28    AMERICAN ARTIBRATION - FISTEN V BROWN

29    FLORIDA BULLDOG – Fisten and Edwards Primary Sources for Journalist JK
      Brown

30    TRANSCRIPT 2885; United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

31    INTERESTING LAWYERS PODCAST ILP  (ADLER) Part 2 WITH BRAD
      EDWARDS 2024

32    REUTERS DISCOVERY LEVERAGING CRIMINAL CASES AND BANK
      CASES

33    ALESSI DEPOSITION, JUNE 1 2016

34    TRANSCRIPT p 2795 et seq SEALED re Charge Carolyn

35    OPR Report; Office of Professional Responsibility Report Investigation into the
      U.S. Attorney's Office for the Southern District of Florida's
      Resolution of Its 2006–2008 Federal Criminal Investigation of
      Jeffrey Epstein and Its Interactions with Victims during the Investigation
      November 2020

36    Giuffre Australia Interview FBI Submitted 135 Mar 7, 2011

37    3516-002 SEAN 

38    Intentionally left blank

39    DOCKET 140 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

40    LEON BLACK "Leon Black Agreed to Pay $62.5 Million" The New York
      Times 7/21/2023

41    TRANSCRIPT 3008 United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

42    DOCKET 435 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

43    DOCKET 311 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

44    DOCKET 252 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

45    NOBODY'S GIRL BY VIRGINIA GIUFFRE AND CO-AUTHOR AMY
      WALLACE

46    VAUGHN INDEX RADAR ONLINE v FBI

47    BROKEN PODCAST EP 2 ,

48    STATEMENT RAI HAMILTON

49    AFFIDAVIT DOROTHY ████████

50    ████████ PODCAST WITH BRAD EDWARDS &
      BRITTANY HENDERSON

51    AFFIDAVIT KEVIN MORAN

52    SENTENCING HEARING GM

53    TRANSCRIPT 973 United States v. Ghislaine Maxwell, Case No. 20-CR-330
      (AJN)

54    ACOSTA TESTIMONY

55    DOCKET 169 p 6 of 12;   United States v. Ghislaine Maxwell, Case No. 20-CR
      330 (AJN)

56    3501-226-022 Pre Meeting Churcher, AUSA Villafana

57    FBI 302 P. 2, #13 "Confidentiality Agreement" between Petitioner and Epstein
      referenced and handed to FBI 3/11/2011 and never disclosed to Petitioner

58    PRINCE ANDREW PHOTO FRONT & BACK

59    BBC PANORAMA TRANSCRIPT 2019 AND PIERS MORGAN TALK TV
      DAVID BOIES 2023

60    DOCKET *620* United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

61    Intentionally Left Blank

62    TRANSCRIPT 544, 607, 516 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

63    ARTICLE: RADAR ONLINE 2011 SEX SLAVE LAWYERS

64    BBC PANORAMA TRANSCRUPT 2019

65    *Deliberately left blank*

66    RADAR ONLINE v FBI DOC 38 1-17-cv-03956-PGG p.

67    DOCKET 38 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

68    TRANSCRIPT PAGE 263 LINES 16-24 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

69    DAILY MAIL PHOTO THAT CHANGED THE WORLD BY SHARON CHURCHER NOV 18, 2025

70    FLIGHT MANIFESTS RELEASED REDACTED BY US CONGRESS

71    TRANSCRIPT TRIAL P1706-1973 PAGE 1819 12-1 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

72    TRANSCRIPT p 1974-2027 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

73    TRANSCRIPT TRIAL p 2028-2295 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

74    TRANSCRIPT page 34 lines 2-5 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN) p. 68:2-4. 277:3-6

75    *Intentionally left blank*

76    DOCKET 38 *RADAR ON LINE v FBI filed 10/29/21 p 23-25*

77    *Intentionally Left Blank*

78    Senator BEN SASSE, former member of Senate Judiciary Committee

79    *Intentionally left blank*

80    TRANSCRIPT p 2542-2738 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

81    NON-PROSECUTION AGREEMENT (NPA) US v Jeffrey Epstein

82   COURT OF APPEAL ORAL ARGUMENT US v Ghislaine Maxwell No. 22-1426-cr

83   ARTICLE: HNL SEX RING SECRETS EXPOSING JEFFREY EPSTEIN

84   Jane Doe 84 STEPS TRANSCRIPT, Sit down interview ABC

85   DANIELLE BENSKY  JANE DOE 3 v INDYK AND KAHN

86   DOCKET 207 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

87   DOCKET 239  United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

88   *LAW AND CRIME DEC 28 2022*

89   ABC FORMER LEAD FEDERAL PROSECUTOR (AUSA VILLAFANA)

90   TRANSCRIPT 2910 Dec 20 Closing  United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

91   DOCKET 63 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

92   TRANSCRIPT p 2834-3091 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN) p. 2881-2884

93   TRANSCRIPT  p677-904 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

94   Tr. 3139, 3140:1-18

95   RODRIGUEZ DEPOSITION JULY 29 2009

96   *Intentionally left blank*

97   RODRIGUEZ CRIMINAL COURT CASE CRIMINAL COMPLAINT

98   TRANSCRIPT p1172-1235

99   *Intentionally left blank*

100   BIRTHDAY BOOK RELEASED BY US CONGRESS 2025 p.000203

101   DOCKET 317 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

102   TRANSCRIPT  p 918-21 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

103   TRANSCRIPT p 1141-1422 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

104   *Intentionally left blank*

105   PARKINSON GRAND JURY HANDWRITTEN SUMMARY/NOTES

106   TRANSCRIPT p905-1140 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

107   TRANSCRIPT p 407-765 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

108   *Intentionally left blank*

109   Rothstein December 22 2011 Deposition

110   ALESSI p 952-967

111   AGREEMENT FOR SALE OF 44 KINNERTON STREET

112   DOCKET 286 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

113   DOCKET 247 page 8 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

114   DOCUMENTARY: SECRETS OF PRINCE ANDREW

115   DAILY MAIL 3/7/2011 RE JANE

116   AIDALA GREEN LETTERS RE IMPACT STMT AND CREDIBILITY of VRG

117   RADAR ON LINE 2/2/2015

118   TRANSCRIPT 607 LINES 11-12 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

119   DAILY MAIL 4/27/2025

120   DOCKET 93 p 37 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

121   TRANSCRIPT 2910 line 5-25, 2911-12 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

122   DAILY MAIL JANUARY 5 2025

123   Sharon Churcher/Tony Lyons transcript

124   TRANSCRIPT 107-406 United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN); 263, 16-21; 238,8-11; 325,4-5; 218,7-10

125   3501.226.072

126   3501.226.030

127   3516.002

128   3501.018.017

129   GJ Transcript Recarey

130     Maurene Comey v US – Complaint 2025

131     Press Release  USAO SDNY July 6 2020

132     TRANSCRIPT 12/7/2021 Jane communicating with brother about his evidence
        p.1424 et seq

133     EVIDENCE OF ▮▮▮▮▮▮(Trial transcript 1748; 3516.002 p. 3)

134     (Transcript 2821 line 15-16 EXHIBIT 134) "I didn't permit and there will be no
        argument about the Governments motivations ".

135     Juror#50 newly revealed jurors were *"confused"* on legal interpretation of the law
        and on definitions (REUTERS Jan 5 2022; DAILY MAIL JAN 5 2022)

136     DOCKET 593

137     Transcript 3126 line 16-21)

138     DOCKETS 249, 255, 265

139     DOCKET 257

140     DOCKET 353

141     Danielle Bensky and Jane Doe 3 individually and on behalf of all other similarly
        situated v. Darren Indyke and Richard D. Kahn at P. 23 para 88

142     STEPTOE LETTER 1:10-cr-00490-RMB DOC 6

143     CVRA DKT 205-2 p.10 Notes 9-10

144     TRANSCRIPT Memorandum Opinion & Order, Nov 1, 2021; Page 15 line 22
        page 16 line 27 line 1-3

145     Tr 2517 line 5-17

146     3501-492-003

147     Jane Doe 1 and Jane Doe 2 v.US  08-cv-80736 (S.D.Fla July 4th 2013)

148     TRANSCRIPT:19 CR 490 (RMB) P.14-15

## INTRODUCTION

Petitioner Ghislaine Maxwell, proceeding pro se, respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct her conviction and sentence. Since the conclusion of her trial, substantial new evidence has emerged from related civil actions, Government disclosures, investigative reports, and documents demonstrating constitutional violations that undermined the fairness of her proceedings.

This newly available evidence—derived from litigation against the Federal Bureau of Investigation, various financial institutions, and the Estate of Jeffrey Epstein, as well as from sworn depositions, released records, and other verified sources—shows that exculpatory information was withheld, false testimony presented, and material facts misrepresented to the jury and the Court. The cumulative effect of these constitutional violations constitutes a complete miscarriage of justice, rendering Petitioner's conviction invalid, unsafe and infirm.

Petitioner raises nine principal grounds for relief, each supported by newly discovered or previously suppressed evidence. In the light of the full evidentiary record, no reasonable juror would have convicted her. Accordingly, she seeks vacatur of her conviction, an evidentiary hearing, and such other relief as this Court deems appropriate and justice requires.

## LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence if it "was imposed in violation of the Constitution or laws of the United States," if the court lacked jurisdiction, or if the conviction resulted in a "fundamental defect which inherently results in a complete miscarriage of justice." Gomez v. United States, 87 F.4th 100, 106 (2d Cir. 2023); Kassis v. United States, 3 F.4th 556, 564 (2d Cir. 2021).

Because Petitioner proceeds pro se, her submissions must be liberally construed and held to less-stringent standards than those drafted by counsel. United States v. Parisi, 529 F.3d 134, 139 (2d Cir. 2008); Publicola v. Lomenzo, 54 F.4th 108, 111 (2d Cir. 2022). Courts must interpret such pleadings broadly to determine whether they raise colorable legal claims.

This motion is timely under § 2255(f) because the Supreme Court denied certiorari on October 6, 2025, and the newly discovered evidence presented herein could not, with due diligence, have been obtained earlier. The grounds set forth below meet the threshold showing required under § 2255 and warrant full consideration, an evidentiary hearing, and the appropriate relief.

POINT ONE

Juror Misconduct Violated Petitioner's Sixth Amendment Right to an Impartial Jury

A.    Overview

Petitioner's conviction must be vacated because Juror #50 ("Scotty David") gave false answers during voir dire, concealing a history of sexual abuse directly relevant to issues at trial. Subsequent interviews, new evidence and sworn statements confirm intentional concealment and actual bias, depriving Petitioner of her Sixth Amendment right to an impartial jury and her Fifth Amendment right to due process. U.S. Const. amend. VI, Impartial Jury Clause, U.S. Const. amend. V, Due Process Clause

B.    Governing Law

A verdict rendered by a juror who intentionally conceals material information during voir dire is constitutionally infirm. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984); Smith v. Phillips, 455 U.S. 209, 217 (1982). The Second Circuit holds that when a juror's deception indicates bias, the verdict must be set aside. United States v. Nelson, 277 F.3d 164, 201 (2d Cir. 2002); 2nd Cir 2002 Torres v US 128 F3d 38,43 (2d Cir 1997. See also Dyer v Calderon, 151 F3d 970,983 (9th Cir 1998)(en banc).

C.    Factual Background

Following the verdict, Juror #50 publicly disclosed having been a victim of sexual abuse, a fact he denied in voir dire. At the post-trial hearing, Juror #50 conceded his public statements but minimized their significance. (Dkt.645 at 23:19-24) EXHIBIT 1. The court denied a new trial finding he had made an" inadvertent mistake". (Dkt.653 at 10) EXHIBIT 2; that he had not 'committed perjury and lied in an effort to be on the jury'[1]. (id at 39) EXHIBIT 2. In fact, Juror #50 lied in his written responses to the Voir Dire Questionnaire and in his oral answers to the court.

New reporting contradicts the courts findings and establishes actual bias. At the hearing Juror #50 :

1.    Stated he learned of the sexual abuse questions on the questionnaire during the Daily Mail interview Jan 5, 2022. (Dkt.645 at 15:19-22) EXHIBIT 1. The Court relied on his answer to deny a new trial  (Dkt.653 at 18) . EXHIBIT 2 .

---

[1] Juror 50 pleaded the 5th at the hearing and was granted immunity to testify. (Dkt.645:14-25, 645:1-19) EXHIBIT 1.

Contradiction: He learned of sexual abuse questions prior to Daily Mail interview in his first interview with Lucia Osborn Crawley ("LOC") on December 31st 2021. ("Lasting Harm" at page 219) EXHIBIT 3.

2.      Denied discussing the consequences of revealing his history of sexual abuse with *any* reporter. (Dkt.645 at 45:7-13) EXHIBIT 1 The Court relied on his answer, stating "he was incentivized to tell the truth or face perjury charges". (Dkt. 653 at 16) EXHIBIT 2.

Contradiction: He discussed the "repercussions" with a reporter, who was also a trained lawyer. (PODCAST The Kicker at 28.50m Jan 7 2022) EXHIBIT 4 LOC 2/4/24.

3.      Scotty David claimed he did not discuss his sexual abuse in detail in interviews. (Dkt.645 at 22:13-17 ) EXHIBIT 1. The Court relied on his answer; that he gave no details of his sexual abuse: (Dkt.653 at 22) EXHIBIT 2.

Contradiction: "He talked about his own abuse." Therefore, *he did* discuss his abuse in detail with a journalist, he wanted "his story of abuse told". (Independent 4th Feb 2024, EXHIBIT 8 and The Objections Podcast at 4.06 m) EXHIBIT 5.

The Court denied a new-trial motion (Dkt. 653 at 22) EXHIBIT 2, finding "inadvertence". However, Juror #50's later statements contradict that finding, his contradictions appear to be deliberate falsehoods (Dkt.653 at 13) EXHIBIT 2, that establish actual bias and knowledge of his inaccurate responses in Voir Dire and his willingness to lie to get seated on Petitioner's jury.

D.      Disregard for Court Instructions

During the Hearing Juror #50 stated he was "not concerned with following the judge's instructions." (Dkt. 645 at 18:15-16.) EXHIBIT 1. Such willful defiance demonstrates partiality. His dishonest answers, a lack of candor, and the judge's erroneous reliance on his truthfulness denied Petitioner a fair trial by an impartial jury when the trial judge refused to grant a retrial. (Dkt 653 at p38) EXHIBIT 2. (See Dyer, 151 F.3d at 983).

E.      Bias

Juror #50 described his abuse as the 'same' as matters at trial "I wanted people (Jurors) to understand from someone else that had "gone through *the exact same thing*" [emphasis added] [Paramount+ "Ghislaine Maxwell: Partners in Crime at Episode 4:47:21m. The verdict is it over". Aired Apr 6 2022.] EXHIBIT 7.

The Court determined that Juror #50's abuse was 'not so similar' to exercise her discretion. However, what is important is what *the Juror thought and felt* [emphasis added] not how the Judge *thought* he (the Juror) felt. (Docket 645 at 33 EXHIBIT 1. Defense requested that the Judge pause to review 'a bombshell interview' with Juror #50

in which he revealed that his abuse was "*the same*" as the matters at trial, before she issued her ruling. She declined to review the material and critically, Juror #50 in the bombshell interview revealed, that his abuse was the 'same' as the matters at trial. (Dkt 653 at 11, fn 2) EXHIBIT 2; Episode 4 at 47.21m. EXHIBIT 7

F.    At least 2 Additional Jurors concealed their sexual abuse in Voir Dire

1.    Juror #50 made clear that he spoke about his sexual abuse 'after' another Juror in fact discussed his sexual abuse revealing an additional juror spoke of their abuse. "I wanted people (Jurors) to understand from **someone else** [emphasis added] who had gone through the exact same thing" [Paramount+ "Ghislaine Maxwell: Partners in Crime. The verdict is it over". Aired Apr 6 2022 at 47:21m.] EXHIBIT 7.

2.    LOC,[2] confirmed 2 additional jurors discussed their abuse in deliberations (Independent. "My part in triggering Ghislaine Maxwell's appeal that could lead to a retrial". Sun. 4th Feb.2024) EXHIBIT 8. LOC spoke to the additional jurors. (Lasting Harm at p 193) EXHIBIT 3. The Court sealed the correspondence from the Jurors who wrote to the Court, not disclosing content to the Petitioner. The Court ruled there was not sufficient evidence to prove that additional jurors discussed their personal history of abuse and ruled the New York Times article "inadmissible hearsay". (Dkt 620 at p 11) EXHIBIT 60.

G.    Prejudice

Jurors were carefully selected by Petitioner's Counsel. *None* of the deliberating or alternate jurors had answered "yes" when asked if they were a victim of sexual abuse, assault or harassment. (Dkt. 613 at 11 n.4) EXHIBIT 9. Participation of even one biased juror violates the Sixth Amendment. Fullwood v. Lee, 290 F.3d 663, 678 (4th Cir. 2002). Here, *three* jurors concealed abuse histories, creating impermissible bias. Pena-Rodriguez v. Colorado, 580 U.S. 206 (2017). The importance of unbiased jurors was revealed when Juror #50 stated that a number of the other jurors had "serious credibility issues" with some of the witnesses. Paramount+ Episode 4 at 14.06 EXHIBIT 7. Juror misconduct should reverse a conviction when " a non-speculative impropriety has occurred." US v. Ianniello F.2d 540, 543 (2d Cir .1989)

Conclusion

Because Juror #50's misrepresentations establish both intentional concealment and actual bias, and at least 2 additional jurors concealed their sexual abuse from the Court in voir dire , the Petitioner's conviction rests on an unconstitutional jury of 9. Under *McDonough* and *Torres*, the Court must vacate the judgment or at the very least grant an evidentiary hearing.

---

[2] a juror called the court to report an unsolicited contact with a journalist, Dkt.620 at p 10, fn 5 EXHIBIT 60 and LOC reveals talking to other Jurors (Lasting Harm at 193 (published 2024).

POINT TWO

Suppression of Grand Jury Testimony of Testifying Witnesses Violated Due Process and the Brady Doctrine

A.     Overview

The prosecution concealed Det. Michael Parkinson's grand-jury testimony, EXHIBIT 11 which conflicted with his trial testimony EXHIBIT 10 and undermined the Government's only[3] evidence, a massage table, establishing the interstate-commerce element of Counts 5 and 6. This suppression of that grand Jury testimony violated the holdings in Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959).

B.     Governing Law

*Brady* requires disclosure of exculpatory evidence; Giglio v. United States, 405 U.S. 150, 153–55 (1972); United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998). Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."— *Brady v. Maryland*, 373 U.S. 83, 87 (1963)

If the Government deliberately fails to disclose evidence, the standard is less demanding. *United States v. Bravo*, 808 F. Supp. 311 (S.D.N.Y. 1992) ("If it can be shown that the Government deliberately suppressed evidence, a new trial is warranted if the evidence is merely material or favorable to the Petitioner.") (citing *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir. 1973)). Knowledge of evidence held by one Government agency can also be imputed to the Government as a whole. *Bravo*, 808 F. Supp. at 320 n.10 ("For purposes of *Bravo*, 'the Government is but a single entity, each member of which is charged with the knowledge of the whole.'").

C.     Factual Background

At trial, Parkinson testified he seized a massage table from Epstein's bathroom (with a shower) in his Palm Beach residence to prove interstate commerce.(TR 1089 line 10-14) EXHIBIT 10 However, his grand-jury testimony, released in 2024, shows he did not identify Epstein's table from JE's bathroom (with a shower), but a different table in an adjacent bathroom with a tub. (Parkinson GJ 110:5–24) EXHIBIT 11. Carolyn, the sole witness to Counts 5 and 6, described the location of Epstein's massage table which was in a bathroom, with a steam room and a shower, no tub.[Emphasis added] (Tr

---

[3] Defense argued a lack of sufficiency of the evidence to convict on the massage table (Tr.2908-2909) EXHIBIT 92, the government argued that Carolyn was abused on the table – which was all that was required. (Tr.2894:25, 2895:1-4) EXHIBIT 92. Petitioner was charged with sending gifts to Carolyn in the Indictments but the government admitted the allegation was not proved at trial (Tr.2795:10-21) EXHIBIT 34 sealed 12/18/21. The table was the sole evidence produced for interstate commerce.

1521:18-25, 1522:1-12) EXHIBIT 12. Parkinson did not describe collecting any evidence in his Grand Jury testimony. (GJ 111, 5-10; 114, 15-25) EXHIBIT 11, but he did at trial (Tr.1097:17-21) EXHIBIT 10. He also stated no massage oils were found in the room with the table, and that the 'dildo' was found in a different room. (Parkinson GJ 111:5–21), EXHIBIT 11 contradicting trial claims (Tr. 2888:5–9) EXHIBIT 10. Government witness Alessi testified that there were massage tables in every room (Tr.878:9-12) EXHIBIT 13  this fact, combined with the concealed Parkinson's Grand Jury testimony, would have allowed Petitioner to argue that the table produced at trial was not Epstein's massage table and should not have been admitted into evidence as Epstein's table thus denying the Prosecution the necessary interstate commerce element.

The Government's duplicity is compounded by their release pretrial of only handwritten notes of Parkinson's Grand Jury proceedings EXHIBIT 105 which conflicts with the evidence in the Transcript released in 2024 EXHIBIT 11. The Government knew of this suppression.

Petitioner was denied the opportunity to cross-examine and impeach the witness regarding the only evidence regarding the massage table which we know from the statements of  Juror #50 was critical in establishing the required element of interstate commerce.

D.     Materiality and Prejudice

Parkinson's grand-jury statements, had they been disclosed, would have served to undermine the required "authentication" of the Massage Table the only exhibit adduced to fulfill the Government's required jurisdictional element of interstate commerce. Failure to disclose the statements to the Defense denied the opportunity for effective cross-examination and violated the Confrontation Clause,  Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) and further denied the effective challenge to the Government's admission and authentication of that critical exhibit. Without Parkinson's alleged authentication, proof of interstate commerce failed and therefore Counts 5 and 6 should have failed. Further Juror #50 declared, "it was easy to prove guilt through the massage table". EXHIBIT 7 PARTNER IN CRIME Episode 3 24.45m. Such a statement by a critical juror demonstrates that had that massage table been properly excluded in the absence of lawful authentication and had Parkinson's testimony, at trial, been properly exposed as contradicting his Grand Jury testimony, there is a reasonable probability that there would have been a different result.

E. Conclusion

If the Government knowingly fails to disclose such exculpatory evidence, the standard is clear: "[I]f it can be shown that the Government deliberately suppressed evidence, a new trial is warranted if the evidence is merely material or favorable to the Petitioner." The Second Circuit has explained that exculpatory evidence is "material" if

"there is a reasonable probability that, had the evidence been disclosed to the Petitioner, the result of the proceeding would have been different," or if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998) (quoting Kyles v. Whitley, 514 U.S. 419 (1995)). [4]. The Government must produce exculpatory evidence even if the Petitioner does not specifically request it. United States v. Agurs, 427 U.S. 97, 107 (1976). Suppression of Parkinson's grand-jury testimony constitutes a classic *Brady/Napue* violation warranting vacatur of Counts 5 and 6 or an evidentiary hearing. For purposes of *Brady* the government is but a single entity, each member of which is charged with knowledge of the whole. *Brady* at page 87. Further the prosecutor has an affirmative duty to search for exculpatory material *Whitely* at 437-8.

POINT THREE

The Government Violated Due Process by Permitting Private Victims' Counsel to Act as De Facto Prosecutors and agents of the government

A.    Overview

Petitioner's conviction must be vacated because the Government impermissibly delegated investigative and prosecutorial functions to private plaintiff's attorneys—including but not limited to David Boies, Esq, Bradley Edwards Esq, Sigrid McCawley Attorney at Law and Jack Scarola, Esq[5]—who represented civil claimants with direct financial interests in the outcome of Petitioner's criminal case (hereafter "Plaintiff's Lawyers"). Their coordination with federal prosecutors compromised the neutrality of the

---

[4] United States v. Bravo, 808 F. Supp. 311, 319 (S.D.N.Y. 1992) (citing United States v. Kahn, 472 F.2d 272, 287 (2d Cir. 1973)). Knowledge of exculpatory evidence held by one Government agency can also be imputed to the Government as a whole. Bravo, 808 F. Supp. at 319 n.10 ("The Government is a single entity, each member of which is charged with the obligation of compliance.").

[5] In Netflix the lawyers stated they were all working in concert, in common interest (Netflix) EXHIBIT 27 (Dkt.247 at 8) EXHIBIT 113; Edwards and known and unknown Plaintiff's Lawyers met with the Government in 2016 to foment the investigation (Dkt.285-1) EXHIBIT 24. The Plaintiff's Lawyers were all working together; privilege was asserted between them and Complainants even when it did not appear that they represented the parties. Boies Schiller lawyer Sigrid McCawley asserted privilege for Scarola with Giuffre (see Bradley J Edwards and Paul G Cassell v Alan M Dershowitz. Case 1:5-cv-07433 LAP filed 1/9/24 at 205:19-20 . Scarola represented Edwards and Cassel in the same deposition (id at 5:1-2) EXHIBIT 63. The court denied the issuance of a subpoena on Boies Schiller as the coordination between Boies Schiller and the Government was "conclusory speculation' and the Government had made good faith representations as to its Brady obligations (Dkt 252 at 6) EXHIBIT 44. The Affidavits of Maurene  Comey EXHIBIT 66 filed in Radar Online v. FBI Case 1:17-cv-03956-PGG reveals extensive material withheld from Petitioner under 'client attorney privilege' Dkt 38 page 24-25 10/29/21. (EXHIBIT 76) and Vaughn Index EXHIBIT 46. The lawyers participated in joint meetings, and with Miami Herald journalist Julie K Brown (hereinafter JKB) who writes about Edwards and McCawley meeting together to interview a 'new victim' March 2018 (JKB at 188 ).EXHIBIT 15 . The Plaintiff's Lawyers were the principal sources for JKB's Miami Herald series credited by USAO Berman with helping ignite the new investigation. (Uustal 32.16 43.30-44.17) EXHIBIT 26  and Dkt 204 at p65 fn 31, 66 EXHIBIT 20.

proceedings and created structural bias in violation of the Fifth Amendment's guarantee of due process U.S. Const. amend. V, Due Process Clause.

B.    Governing Law

The Supreme Court holds that the Government may not outsource prosecution to an interested private party. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987) ("A prosecutor must be disinterested; participation by an interested party is a structural defect."); Berger v. United States, 295 U.S. 78, 88 (1935). The Second Circuit likewise recognizes that criminal cases must be conducted in the public interest, not as private retribution. United States v. Stein, 541 F.3d 130, 151 (2d Cir. 2008). Brady obligations extend to information known to "others acting on the Government's behalf." Kyles v. Whitley, 514 U.S. 419, 437–38 (1995); United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). Thus, knowledge held by cooperating private attorneys is imputed to the prosecution.

C.    Factual Background

From 2016, law firms such as Boies Schiller Flexner LLP and Edwards Pottinger LLP maintained parallel civil suits against Epstein's estate while exchanging witness statements and strategic drafts with the U.S. Attorney's Office for the Southern District of New York ("SDNY"). Documents released in Radar Online v. FBI and from other sources reveal that these lawyers conspired and colluded with the Government and conducted the investigation for the Government. Attorney General Barr admitted in his recent hearing before Congression Oversight in 2025 that the investigation into Petitioner was not led by the FBI (Barr Transcript p.55 line 17) EXHIBIT 25

New reporting reveals that the Plaintiffs Lawyers (hereinafter " Plaintiffs Lawyers")

1.    Confirmed they "instigated" the SDNY investigation. (ILP part 3 at 4.35m) EXHIBIT 31 and supplied thousands of pages of evidence. (Uustal at 37:07, 45:59) EXHIBIT 26.
2.    Revealed the use of media was a strategy to foment the criminal investigation[6], and the Plaintiff's Lawyers were the principal sources for JKBs Miami Herald series, and book, suppling JKB with emails and other documents between the Government and Epstein's Defense. [7] Edwards's co-

---

[6] David Boies on camera stated that they had tried for years to involve the media in this case. Secrets of Prince Andrew Part 2 S1 E2 at 5.26m) EXHIBIT 114

[7] New evidence reveals Edwards and his coworker Fisten were primary sources for JKB. Edwards acquired thousands of documents between the Government and Epstein's Defense through the CVRA litigation (Uustal at 32.16 minutes and 43.30 -44.17 minutes) EXHIBIT 26. Fisten gave JKB work product information. Michael Fisten v Julie K Brown 01-20-0015-8776 EXHIBIT 28 at page 4 point 16. JKB writes about seeing non-public drafts of the NPA and " leaked " depositions at EXHIBIT 15). (JKB Perversion of Justice at 159,319. OPR and public mislead as Julie K Brown sources were not from public information

worker, Fisten furnished JKB with his work product, including information
on complainants, the NPA and Alexander Acosta, (former US Attorney
SDFL) (hereinafter (Acosta"). EXHIBIT 81. AG Barr acknowledged that
the SDNY was also known for its "leaks". Barr Testimony before
Congressional Committee on Oversight and Public Reform (Transcript
8/18/2025 at page 97 lines 8-9) EXHIBIT 25.The government admits the role
of JKB and that of the Miami Herald reporting. Dkt 204 at 65 n 31, 66.
EXHIBIT 20. JKB reveals working secretly with the Plaintiff's Lawyer's
months before her series ran – meeting with them and 'a new victim' as
Edwards describes they   were working covertly with the SDNY at the same
time[8]. JKB referenced multiple meetings Plaintiff's Lawyers had with SDNY
over the years to incite the investigation  (JKB at 282) EXHIBIT 15 .

3.  Confirmed they worked "symbiotically' with the SDNY, shared and received
information working as 'a team' for the 'redo' of the first investigation,
helping the Government to not 'screw' up the investigation again as the
Government 'had nothing'. (Uustal at 45.59) EXHIBIT 26

4.  Discussed their role in developing evidence, gathering evidence, proposing
victims, taking witness statements, and providing the prosecutorial strategy.
Stating that the prosecution was going to use "the identical evidence", that the
Plaintiff's Lawyers gave the road map the jury was going to see in the
Petitioner's trial (Netflix "Ghislaine Maxwell Filthy Rich" Nov 25, 2022)
EXHIBIT 27 (The identical victims and the evidence utilized against the
Petitioner in civil defamation case in 2015. [9] ((Dkt.285 at 2-4.) EXHIBIT 24.)

---

(OPR at iii.) EXHIBIT 35. That Edwards and Fisten were the primary sources is cited in the interim award
ruling case no. 01-20-0015-8776 dated 30th Dec. 2021 David Lichter arbitrator at page 2, EXHIBIT 28.
and repeated in the Bulldog April 6 2022 at page 2 EXHIBIT 29.PRIVATE EYE SLAMS RULING

[8] New reporting suggests collaboration between JKB. Plaintiff's lawyers met with JKB as early as 2017
(JKB at 165.  ) EXHIBIT 15. (Nobody's Girl at 314)EXHIBIT 45. JKB writes about a meeting held months
before her series on Epstein ran in the Miami Herald held with Edwards, McCawley, Giuffre and "a new
victim" March 2018. (JKB Perversion of Justice at 188) EXHIBIT 15. Edwards writes about meeting the
"new victim" and reveals he was working covertly with the SDNY at the same time and happy to let JKB
take credit for having started the new investigation into Epstein so his hands could stay clean. (Relentless
Pursuit at 375-376  EXHIBIT 14).  The Government Omnibus Opposition mislead the Court, it denied the
Plaintiff's Lawyers played any role in instigating the investigation  AUSA Bennan noting the role of
'excellent investigative journalism and the role of JKB. (Dkt 204 at 65 n.31, 66) EXHIBIT 23.

[9] Petitioner pre trial argued that Plaintiff's Lawyers colluded with the Government, instigated the
investigation and in 2016 engineered to have the Petitioner charged with perjury in conjunction with the
Government. Dkt 3 ( Petitioner has no access to Dkt 3), Dkt 134 at 1-2, Dkt. 134 at 1-2, Dkt 140 at 1-2, Dkt
285 at 15-18) EXHIBITS 39,16. The Government obtained Boise Schiller's 'entire file', through a 'broad
and unusual' subpoena granted by Chief Justice McMahon who found there was no evidence of collusion
between Boies Schiller and the Government, and that she was not facing a 'Chemical Bank situation' where
material was forwarded to the Government to foment and investigation. (Dkt. 311-4 at 21) EXHIBIT 43.

The above reveals a pattern of behavior that begins in 2011 when Plaintiff's Lawyers attorney Edwards shared confidential and sealed documents obtained from civil suits with AUSA Villafana the USAO for SDFL. 3501.226.072 EXHIBIT 125

5.  The lawyers proposed civil suits to acquire evidence for a criminal trial (ILP part III at 46.50 minutes EXHIBIT 19. The Plaintiff's Lawyers confirmed the civil suits were the reason the Petitioner is in jail. (Objections Podcase Episode 72 at 9:15 m 9 EXHIBIT  88

6.  Plaintiff's Lawyers confirmed that they attended the criminal trial and, participated in investigating evidence litigated at trial, and  during trial (Uustal 1hr25m) EXHIBIT 26 (Tr. 2885; lines 1-14) EXHIBIT 30.

7.  Discussed the financial nexus between the parties and discussed divvying up Epstein's assets (to include 2 private islands) and holding the Estate hostage between the lawyers and the Government to their mutual benefit. (ILP. part 2, intro) EXHIBIT 19 (Uustal 1hr 10.32h). EXHIBIT 26.

8.  Discussed personal motives to seek to reopen the investigation: a new investigation would provide insurance in the face of losing a civil suit against Epstein.(ILP part 3, at 12.02m) EXHIBIT 19. Guiffre testified she was contacted because of the same Epstein civil suit (Case 1:15-cv-07433-LAP doc 1335-3 filed 1/9/24 at p. 133:13-20. EXHIBIT 21 Guiffre at the same time was invited to join the The Crime Victims' Rights Act, 18 U.S.C. § 3771. case (hereinafter "CVRA") CVRA case (BE Book Relentless Pursuit at 170) EXHIBIT 14. The investigation was fomented to promote the CVRA case (Docket 285-3 at page 3) EXHIBIT 20  Documents from Giuffre' CVRA given to the Government in 2016 (Docket 285-3 at 3 EXHIBIT 20 ) Doc 285-3 page 6. ▓▓▓▓ observes that she felt it would help the CVRA case if the SDNY opened a criminal case. Dkt 285-2 at page 6. EXHIBIT 22

---

The Government argued to Judge Nathan that Boies Schiller played no role in the investigation (Dkt.204 at 129) EXHIBIT 20  and the Petitioner lacked evidence to support the allegations; the Government was aware of its obligations under Brady and it  made good faith representations that it would meet its Brady obligations: discovery and an evidentiary hearing should not be granted. (Dkt.204 at 115-116) EXHIBIT 20; allegations of Government misconduct were baseless. The new reporting reveals that the Government deceived 3 judges about its relationship with Plaintiff's Lawyers and had the Petitioner had the new evidence an evidentiary hearing would have been held and discovery ordered. The Perjury counts were based upon depositions in the civil claim Giuffre v Maxwell, 1:15-cv-07433 (S.D.N.Y.) which revealed the civil plaintiff's lawyers plan  with the Government all along to add perjury counts to the criminal proceeding which is now supported by the newly released evidence set forth above in this document sections 1-11.  See also EXHIBIT 18 at p 5 ▓▓▓▓ ped notes where she was considering perjury charges. These notes were written 6 years after events and with no supporting affidavit, nor was she a witness at trial. Petitioner was denied a subpoena by the Court on Plaintiff's Lawyers because 'the Government had made good faith representation that Government was cognizant of its Brady obligations'. Doc 252  page 6. EXHIBIT 44

9.   The Plaintiff's Lawyers told the SDNY in 2016 that the SDFL wanted to pursue a new investigation of Epstein Docket 285-1 at page 5. EXHIBIT 16. (an important factor in reopening of investigation. Dkt 285 EXHIBIT 16

10.   Discussed leveraging the potential criminal proceedings to reach Confidential settlements with 25 men [10] ( ILP PART III at 12.02 minutes.) EXHIBIT 19 and the criminal case for settlements against various national and international Banks for attorney's Fees. (Reuters Jeffrey Epstein victims sue FBI, allege coverup (Feb 14 2024) EXHIBIT 32). No settlements with the 25 various men were ever disclosed to Petitioner.

11.   Wexner was accused of participating and witnessing abuse ( See Case 1:15-cv-07433-LAP Doc 1335-3 filed 1/9/24 at 20:13-15) EXHIBIT 21 , no settlement with Wexner was revealed EXHIBIT 21. Press reports reveal other potential men including Leon Black who agreed to pay $62.5 Million to Settle Epstein Related Claims and the others that the Plaintiff's Lawyers negotiated (per the press reports). Similarly, no discovery on Leon Black was provided to Petitioner. The New York Times 7/21/2023 (EXHIBIT 32).

Points 1-11 serve to contradict the Government who informed the Courts that Boies Schiller played no role in fomenting the investigation. (Dkt. 204 at 71, 91-92) EXHIBIT 20. The Government confirmed that it had extensive documents it withheld under attorney client privilege, work product and privacy which are normally used in civil cases which improperly shielded the fact that Plaintiff's Lawyers were acting as agents of the Government. Radar Online Doc 38 pages 23-4 EXHIBIT 76.

D. Witness Tampering

New Evidence reveals that Plaintiff's Lawyers were coordinating working with the journalists and the Government to create the false narrative that Petitioner found and paid the complainants for sex. The Plaintiff's Lawyers then paid the complainants to testify EXHIBIT 49.

1.   Witness Carolyn           was coerced into giving evidence by lawyers to support the Governments case in return for money (Affidavit of Carolyn's Mother Dorothy           paragraph 25 EXHIBIT 49). Carolyn revealed that the FBI directed her testimony at trial telling her what she was allowed to say. (Lasting Harm p. 104) EXHIBIT 3.

2.   Churcher reveals in Daily Mail 2025 that 'a prosecutor' reached out to her in 2011 (Churcher). AUSA Villafana held a meeting with Edwards and 'a writer' EXHIBIT 119 (3501.226.072 at 1) AUSA Villafana states she invited a writer

---

[10] Plaintiff's Lawyer Edwards stood at the foot of the Capital 9/3/25 and teased the media about "a list of men" – his clients and other parties discussing 'creating' a list of men, all the while knowing there was a list of at least 25 men with whom there were confidential private settlements all the while misleading the media, the public and US Congress with this misdirection regarding "a list".

to join in her meeting. EXHIBIT 125. On information and belief, the 'writer' was Sharon Churcher (see footnote 11). Non testifying Witness Giuffre reveals that journalist Sharon Churcher[11] provided information and supplied 40 photographs for Giuffre's 302 interviews with the FBI (See Giuffre Nobody's girl at 133 ) EXHIBIT 45, See Vaughn Index PAGE 130, 131,133, 135, EXHIBIT 46).

3.     Plaintiff's lawyers contacted Churcher paid Giuffre additional money for information on Witness Jane . (On information and belief Handwritten notes relating to 3501.226-040,42,43,44 (to which Petitioner no longer has access) EXHIBIT 56. Edwards wrote that Jane " had to be forced" to go public ( BE Book Relentless Pursuit p. 272) at EXHIBIT 14. Daily Mail published an article on Jane on March 7th 2011 EXHIBIT 115 Jane testified at trial she was "blackmailed" (Tr.607:11-12 ) EXHIBIT 118. Subsequently Edwards used Jane's story in the CVRA (Radar On Line Sex Slaves lawyers want well know actress to testify " February 2, 2015 l EXHIBIT 117. By preponderance of the evidence Edwards sought to use public pressure on Jane to persuade her to cooperate and support Giuffre in her civil suit which became the criminal case against Petitioner.

4.     On March 9th 2011 and March 17, 2011 (3501.226.030 EXHIBIT 126) Edwards, a writer and AUSA Villafana met. Churcher appears to have participated in Giuffre's FBI meeting in 2011 (Document 3501.226-022) EXHIBIT 56. Plaintiff's lawyers, similarly, participated, on information and belief, Attorney Edwards and other unknown lawyers, and Giuffre's husband was present at the FBI interview ( Nobody's Girl p 249) EXHIBIT 45. None of the parties were revealed to have participated in the various meetings in Petitioner's discovery in her criminal trial. None of the parties who supplied information to the Government represented Giuffre at the time and the information as such is therefore not privileged information and it should have been disclosed to Petitioner and Petitioner's lawyers in her criminal proceedings. Guiffre states she signed a contract with Edwards in 2013. (Nobody's Girl p. 258) EXHIBIT 45. Per the Vaughan index, the 3rd party who supplied information to the Government on 9th March 2011 on information and belief was either Churcher or Edwards or both in collusion.

---

[11] Edwards introduced Giuffre to Churcher. Exhibit 15 p. 170. Churcher met with Giuffre in Australia for approximately 6 weeks. "a Prosecutors reached out to Churcher while she was in Australia (Daily Mail 2025 EXHIBIT 119.). A 'writer' participated with Edwards in an FBI meeting with Villafana 2011. EXHIBIT 125, 3501-226.072. On information and belief the writer was Churcher. Churcher and the lawyers participated in Giuffre's subsequent 302 interview in 2011 3501.226.030 p. 7 EXHIBIT 126 and that information was used in the CVRA and related civil suits and criminal prosecution. Neither Churcher nor Edwards involvement in Giuffre's interviews with the Government were revealed to the Petitioner. Edwards introduced Giuffre to Churcher (Relentless Pursuit at 170 EXHIBIT 15)

Some of this material was not given to the Petitioner in discovery which includes a purported Confidentiality Agreement 3501.226.072 EXHIBIT 57, EXHIBIT 125 between Petitioner and Epstein which would have supported her case to show the employer-employee nature of their relationship. Vaughn Index EXHIBIT 46 page 135, "Items obtained after the conducted interview March 9 2011 page 133." Items obtained after conducted interview March 9 2011", "Items given by private 3rd Party on March 18, 2011 page 131" Interview Notes of 3rd Party dated March 17.2011", "Photograph" page 130, page 92 Material provided to FBI of 3rd Party individual with expressed assurance of Confidentiality March 9 2011.

5.   Giuffre reveals that Churcher "implied that I (Giuffre) was making up allegations as a form of blackmail. (Nobody's Girl at 351) EXHIBIT 45 Churcher stated in a recorded interview with Tony Lyons that Giuffre stories were "obtained through checkbook journalism". Tony Lyons Sharon Churcher p 88, EXHIBIT 123.

6.   Giuffre met with Government Witness Alessi to "get" him to testify. The FBI contacting him and talking to him whilst Giuffre was with him.[12] Tara Palmieri and Broken EXHIBIT 47. Plaintiff's lawyer confirmed he was aware that Giuffre was interfering with witnesses. Broken Podcast; page 36.40, 37.27 EXHIBIT 47

7.   Giuffre met with "new" victims and with new victims' lawyers (Edwards and McCawley) and members of the press at the same time. (JKB at 188) EXHIBIT 15, allowing for contamination and poisoning of memory and the transference of memory from one witness complainant to another.

8.   The Government told Giuffre that they would not call her as a witness because of 'the men'. The men would be a distraction whilst concealing that Plaintiff's Lawyers had settlements with 25 men. (Nobody's Girl at p.360) EXHIBIT 45.

9.   Witnesses travelled together pre-Petitioner's trial to the US Open after the termination of the proceedings against Jeffrey Epstein which was arranged by Plaintiff's Lawyers. Exhibit (Nobody's Girl at p.330) EXHIBIT 45 They discussed the case and compared evidence. Statement of Rai Hamilton EXHIBIT 48.

10.   ▆▆▆▆▆▆▆▆▆▆▆ and Annie Farmer spoke of the "sisterhood" communicating in a "group chat" with every one of the complainants (Trial TR 1248:2-16, 1249:1-14; 2204-5) EXHIBIT 103 This contributed to transference and contamination of memory.

---

[12] See Podcast. Tara Palmieri April 28 , 2025 at 12.06 Epstein survivors fight exploiting Giuffre's death and Broken: Seeking Justice Season 2 Episode 2 at 2. 27 min, 25.39, 36.40 to 37.27, 32.23. EXHIBIT 59 Reveals Plaintiff's Lawyers awareness of Giuffre's witness interference , on camera and FBI contemporaneous involvement.

11.  Jane Doe 84 (Victim 1 from Epstein's 2019 indictment) reported participating in 'group therapy' with other witnesses allowing for transference of testimony and contamination of memory EXHIBIT 84. On information and belief many of the complainants were treated by a single therapist arranged by Plaintiff's Lawyers and the Government also contributing to the transference of testimony and contamination of memory (see footnote 21).

12.  Lawyers participated in controlling and subverting the narrative assisted by the media. Pretrial David Boies, Esq represented that there was evidence to validate that the Prince Andrew Photo was original and seen contemporaneously and used a single page of a deposition to support his claim[13][BBC Panorama transcript] EXHIBIT 64. Evidence disclosed subsequently has revealed that, that that was not the case and that the next few lines on the next page of the deposition, which were deliberately concealed, in fact revealed that the photo was only seen by that witness 10 years later when published in the newspaper (see footnote 13 below) and not contemporaneously as asserted by Boies.

13.  Witness "Jane" interfered with the evidence of her brother who was to give evidence later in the trial when she texted him after the completion of her evidence to give him information and because the witnesses felt free to continue to speak among themselves as they had throughout the legal proceedings. (Transcript 1424 et seq EXHIBIT 132)

Conclusion

The above shows multiple examples of the collusion and transference, contamination and poisoning of stories between the complainants and trial witnesses whose verbal testimony was uncorroborated. The Plaintiff's Lawyers revealed that the complainants consumed media much of which was untrue and made managing the expectation for how much money they would receive in compensation the hardest part of their job (Uustal 1.09.27) EXHIBIT 26. This is contrary to the Governments assertion that Complainants consumed no media. This is contrary to the Governments assertion that the lawyers, both Prosecution and Plaintiffs, were separate (Trial Transcript 3008, line 5-24) EXHIBIT 41 and that there was no collusion, we now know these assertions are false.

---

[13] David Boies represented in a Panorama interview that the photograph of Prince Andrew Petitioner and Guiffre had been seen contemporaneously with events in 2001 by Giuffre's boyfriend, giving a page of a deposition to support the statement. The page fragment actually goes on, over the page, to say on the next page that Guiffre's boyfriend saw the photo only when it appeared in the press in 2011, 10 years later.

The secret settlements with the 25 men were hidden from the Petitioner. That information would have changed the outcome of the trial and Petitioner would have certainly called the men as witnesses. The degree of contamination and collusion between witnesses, combined with the withholding of Brady material by the Government that would call into question the credibility of every complainant that interfaced with Plaintiff's Lawyers, all of them, would have changed the outcome of the trial.

E.     Material evidence Withheld

1.     The Government newly admits it has additional witness authored material not revealed at trial. (Radar Online v. FBI Dkt 38 at 14-15) EXHIBIT 121.

2.     Carolyn reveals she had a My Space account, that the FBI took evidence from her My Space account and her My Space postings were never given to Petitioner (Lasting Harm p. 104) EXHIBIT 3. Acosta confirms victims from SDFL investigation had My Space accounts that "caused problems" (Acosta.Tr.25:7-9) EXHIBIT 54. Carolyn was recognized as a victim under NPA and paid restitution and therefore it is likely that Epstein obtained her My Space postings in order to defend against her allegations and to establish an accurate timeline with contemporaneous records. He did this for other litigants who came up against him in litigation as revealed in the voluminous discovery. Such contemporaneous information can be expected to undermine witness credibility. Carolyn's My Space Account. See Vaughn Index Radar OnLine v FBI page 145, 146, 127, 125, 120, 119, 118, 117,116, 115, 101, 100, 99, 98, 95, 88, 86, 83, 81. EXHIBIT 46.

3.     Giuffre's Diary was not disclosed to Petitioner. Churcher, a Daily Mail journalist confirms she retains to this day, the Giuffre authored contemporary material (Daily Mail Apr. 27, 2025) EXHIBIT 119. Edwards confirmed to the Government that he had 'portions' of the Guiffre diary as early as 2016. (Dkt.285-1 at 7-8) EXHIBIT 24. A copy of Giuffre's diary was never disclosed to Petitioner. The contemporaneous diary is expected to undermine witness credibility, and the Government knew having been told by Edwards that the Diary existed and should have been disclosed to Petitioner.

4.     A few non-consecutive pages of Annie Farmer's diary were disclosed to Petitioner, (Farmer was not considered a victim of crimes alleged as she was considered "of age" United States v. Maxwell, No. 20-CR-330 (AJN), "Memorandum Opinion & Order," Nov. 1, 2021 EXHIBIT 144. The Government stating that the remainder of the Farmer diary was not relevant as Farmer was alleged to have ceased writing it after meeting Epstein the entire diary should have been disclosed to Petitioner as Government is not in the position to judge what is exculpatory and what is relevant. (Dkt.204 at 187) EXHIBIT 20. Her lawyer contradicted that statement – stating she kept a

contemporaneous diary to events [14]. Her diary would confirm the dates she travelled to New Mexico and Thailand and is expected to contradict Farmer's memory at trial. This was Brady and Giglio material that should have been given to the Petitioner in discovery. The trial judge declined to review the diary material even though Petitioner through her legal defense team requested disclosure of the Diary. The Plaintiff's Lawyers were used as a wall to shield the Government from its obligations to disclose. At trial there was conflicting testimony that Farmer was in Thailand in 1996. Trial Tr 2090:13-16. Farmer recalled going to meet her sister in New Mexico in her interview with the FBI in 2006 Tr 2151:9-10. Her mother and a border agent testified that Farmer was in Thailand in fact in 1997 Tr 2517 line 5-17 EXHIBIT 145 Border Control confirmed 1997.

5.     House Committee on Oversight states that the government had notice of Annie Farmer's complaint against Epstein in 1997 ( Acosta Transcript at 30 line 25 page 31 line 1-2) EXHIBIT 54. Petitioner did not receive any notice in discovery that the testifying complainant Annie Farmer had alleged that Epstein assaulted her in 1997 in New Mexico.

6.     Guiffre submitted a photograph with Prince Andrew and Petitioner ("PA Photo") and stated it was stamped on the back March 2001 (Nobody's Girl at p 148.) The photo in fact has no stamp on the back but rather a handwritten note January 2001 (3501.226-029 p.1-41) EXHIBIT 58. Relying on information contained in the Vaughn Index p 130 a photograph was supplied on March 17 2011 by Giuffre to the Government that Petitioner believes was withheld from her discovery and that would have further undermined the credibility of the "PA photo"  and illustrates further the collusion between Plaintiffs' Lawyers and the Government.

7.     Flight Manifests. Congress released selected Non-Testifying Witness (NTW) flight manifests in 2025. EXHIBIT 70. Edwards admitted to the SDNY that he had the manifests in 2016 (Dkt 285-1 at 5). EXHIBIT 24 The manifest is the most accurate log of who flew on Epstein's plane. (Tr.1819:12-1 )EXHIBIT 71. The manifests were not disclosed to the Petitioner by the Prosecution and would have established whether  Jane

---

[14] Farmer's Lawyer reveals , "Annie kept a journal at the time she was abused by Ghislaine Maxwell and Jeffrey Epstein" (Netflix "Filthy Rich ( at 1 hr. 25 min) EXHIBIT 27) In trial, Annie Farmer confirmed that she jounaled through High School (Tr 2121:3-12) EXHIBIT 73 . The above indicating that she journaled through the period when she went to New Mexico. In dispute was when Farmer traveled to New Mexico and Thailand -- there was testimony it was in 1997 (Tr. 2151) EXHIBIT 73 and why she went to New Mexico ( there was testimony it was to visit her sister not to see Epstein) In dispute was who paid for the Thailand trip – there was no corroborating evidence as to who paid for Thailand. The Diary a contemporaneous document would provide answers that would undermine Farmers credibility – undermining the 'enticement' element of the conspiracy. Petitioner's Defense was not permitted to pursue questions about Maria Farmer's visit to New Mexico Transcript 2514:4-5. , 2262  EXHIBIT 11 In recent hearings in Congress Acosta Hearing TR page 30 at line 25 and page 31 1-2 EXHIBIT 54. Congress found that Farmer made a formal complaint in 1997 which was never disclosed to Petitioner. Tr 2517 line 5-17 EXHIBIT Border Control confirmed

flew on Epstein's plane in 1994-1997 as she testified; absent Jane's presence on the flight the Mann act counts failed (Count 1.2.3 and 4). )

8. Petitioner's Confidentiality Agreement referenced at (3501.226-072) EXHIBIT 125 that would have proved the employer, employee relationship between the Petitioner and Epstein (Tr.34 :2-5) EXHIBIT 74 , undermining the narrative that Petitioner was his girlfriend throughout the period. This Confidentiality Agreement was never turned over to Petitioner.

9. The Birthday book recently released was not disclosed to the Petitioner. Only a few pages were given in discovery. On information and belief several complainants at trial wrote letters to Epstein for his birthday that would have undermined the credibility of the various allegations of the witnesses. EXHIBIT 100.

10. Ex parte hearings of complainant's lawyers in the defamation case Giuffre v Maxwell were held in the Chambers of Judge Sweet in camera. The transcripts and underlying documents were never disclosed to Petitioner or her legal team. (These hearings are expected to reveal Plaintiffs Lawyers colluding with the Government as early as 2015). In camera rulings were never disclosed to Petitioner or her legal representatives. Judge Sweet repeatedly reviewed evidence in camera (ex parte) between April–May 2016.

The materials included:

- sealed exhibits
- sealed deposition materials
- briefs supporting privilege claims

Petitioner objected but was never given access to the underlying in camera evidence or the transcripts of the hearing. If the government had access to these documents which they should have under the terms of the broad subpoena to Plaintiff's Lawyers (see fn 9) these materials should have been supplied to Petitioner which would constitute yet another violation of the rules.

12. Petitioner received Non Testifying Witness Melissa's statements from 2019. On a preponderance of the evidence, Melissa made prior statements that should have been disclosed in discovery. Melissa stated that Plaintiff's Lawyer Brad Edwards had been her lawyer "for 13 years" 3501-492-003 at p. 4 EXHIBIT 146. ▬▬ gave a statement that Melissa received a settlement when "they all got lawyers" 3516-002 at p 3 EXHIBIT 127. In New Evidence revealed by JKB (whose information was supplied by Edwards, (see fn 7) Edwards had 7 clients in 2008 and introduced all of his clients to the FBI per JKB (JKB 163) EXHIBIT 15. Edwards wrote that they could be used for a new investigation and inclusion in the CVRA (Relentless Pursuit at 221-2

EXHIBIT 14. Villafana continued interviewing witnesses after Epstein signed the NPA and continued updating the prosecution memo reflecting the new interviews (OPR 200-2, EXHIBIT 35. (Petitioner did not receive the prosecution memo in discovery) The newly revealed reporting that the Plaintiff's Lawyers acted as agents of the Government reveals that they gave evidence that included witness statements to the Government, the identical evidence that the Government was going to use at Petitioner's trial (Netflix, Filthy Rich November 25 2022 EXHIBIT 27. The Government stated that they would give Petitioner all NTW statements (DKT 204 at p, 189 EXHIBIT 20. On a preponderance of the new evidence prior 2019 statements of Melissa exist and they are expected to undermine ▮▮▮▮ and Carolyn's credibility as they testified that they introduced and trafficked Melissa to Epstein and the statements are expected to have impeachment material and timeline information that was not available to Petitioner at trial.

12.    Government witness Shawn ▮▮▮▮: On information and belief the Petitioner was not told that ▮▮▮▮ had a detainer recorded against him that was cancelled in exchange for his testimony. ▮▮▮▮ had an extensive criminal record, it appears given the timing, the detainer was removed and that he was offered a deal in return for his testimony. There was no proffer disclosed to Petitioner. EXHIBIT 37 Further he was not charged with sex trafficking for Epstein and in his Court testimony he stated he was more than 18 years of age and that he supplied minors to Epstein but importantly he testified he never met Petitioner. Further in his FBI 302's he adamantly stated that the woman with whom he spoke at Epstein's had no English accent. At trial ▮▮▮▮ gave evidence that the woman had an English Accent and was the Petitioner indicating that the Government interfered with his testimony or called a witness knowing of the intended perjury. (Trial transcript 1748; 3516.002 p. 3 EXHIBIT 133) On information and belief ▮▮▮▮ could have been one of the 25 men with whom Plaintiff's Lawyers made a secret settlement. Petitioner was entitled to this information that was concealed from Petitioner.

The new information contradicts the Government's arguments to the Jury that:

a.    Lawyers were all separate (Tr.3008:14-17) EXHIBIT 41

b.    There was no collusion between the parties (ID:17-21) EXHIBIT 41

c.    The witnesses did not consume media (Tr.ID:5-7) EXHIBIT 41

d.    The lawyers had no financial motivations (ID:23-24) EXHIBIT 41

e.    That the Government  claims that they identified Boies Schiller from public documents (Docket 204 at 66)  EXHIBIT 20

f.     That Boies Schiller had played no role in instigating the investigation (ID at 89) (EXHIBIT 41).

F. Petitioners Arrest and Indictment was a political solution to the Death of Epstein in Government Custody.

Petitioner was denied the ability at trial to (1) question the Government about the Florida Investigation (2) to reference the NPA, to obtain discovery regarding the NPA (3) to question why Petitioner was never charged in SDFL (4) the scope and timeline of the SDNY investigation or any evidence to demonstrate the motives of the Government in part "because it suggested the Petitioner's innocence". Transcript Nov 1, 2021; Page 15 line 22 page 16 line 27 line 1-3 ) EXHIBIT 144 "I didn't permit and there will be no argument about the Governments motivations ". (Transcript 2821 line 15-16 EXHIBIT 134)

1. AG Barr admitted that post Epstein's death the Government was looking for someone to indict for trafficking (Barr Tr 58:18-19 EXHIBIT 25. The Petitioner was not named in Epstein's first or second indictment. The Government could have indicted the 4 named co-conspirators, or any of the 25 men that settled with the civil plaintiff's lawyers for the complainants (see footnote 10) but did not.

2. AG Barr stated that the initial investigation was not led by the FBI (Barr Tr 55:17) EXHIBIT 25. The investigation in other words was not a typical evidence-based investigation in which neutral investigators follow leads: The fact that the investigation was not led by the FBI is evident in "Radar OnLine case papers and by the extensive material withheld under client attorney privilege, executive privilege and privacy – set forth in the Vaughn Index (EXHIBIT 46) appearing to confirm that the evidence was supplied and created by the Plaintiff's Lawyers (see fn 5,6,7,8,9). Rather than following leads where they lead, the Government started with a conclusion and then trawled and cherry picked evidence to support that conclusion ignoring anything that was exculpatory. When the FBI encountered witnesses that did offer exculpatory evidence they shut down the interview and in some cases threatened an indictment against that witness.

3. Comey confirms that the Petitioner was not investigated till post Epstein's death. Post Epstein's death they "uncovered evidence that implicated Ghislaine Maxwell" (2025 Complaint Maureen Comey v US at p 11 point 33. ) EXHIBIT 130. This is confirmed by the fact that interviews with the complainant's at trial were not conducted till post Epstein's death ( see 3500 material re: Jane and ████████ SEALED not accessible to Petitioner in Custody).

4. Petitioner was precluded from asking questions concerning investigatory techniques which would have revealed the collusion between Plaintiff's Lawyers and prosecutor' s motive. (Tr Tr 2818 lines 3-9 and 2821 line 15-16) Not available to Petitioner in custody.

Ghislaine Maxwell 02879-509 Petition for Writ of Habeas Corpus          19
pursuant to 28 U.S.C. § 2255

5. Petitioner was denied her 6th Amendment Rights by the Prosecution when the SDNY decided to illegally indict her in White Plains and have her in custody before the first anniversary of Epstein's death in violation of her 6th Amendment rights solely for political theater. Further in petitioning this Court to release Petitioner's grand jury materials the SDNY has not released the White Plains Grand Jury materials.

G. Legal Analysis

The participation of privately interested plaintiff's attorneys in a federal prosecution constitutes a structural violation of due process. Young, 481 U.S. at 807. The Government's concealment of that Radar OnLine material contained in the Vaughn Index of evidence reveals the Government withheld extensive material under client attorney privilege normally asserted to bar discovery in civil litigation  DKT 38:14-15,23-35. (Radar Online v FBI). EXHIBIT 67. The collaboration with the Plaintiff's Lawyers also deprived the Petitioner of impeachment evidence showing bias and motive. Giglio v. United States, 405 U.S. 150, 154–55 (1972); United States v. Rigas, 583 F.3d 108, 125 (2d Cir. 2009).

The Crime Victims' Rights Act, 18 U.S.C. § 3771, (hereinafter "CVRA") affords victims procedural rights; it does not authorize their lawyers to act as Government agents and deputies. The blurring of this line which destroys prosecutorial neutrality is condemned in the landmark case Berger, at p 88. The omitted evidence would have created reasonable doubt. Wade v Mantello, 33 F3d. 51, 58-59 (2d Cir.2003) The voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives protection and privilege for that material.

A defendant moving to dismiss for selective prosecution hears the heavy burden of establishing at least prima facie 1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been signaled out for prosecution and 2) that the governments discriminatory selection of him for prosecution has been invidious or in bad faith US v Berrios 501 F2d 1207, 1211 (2d Cir. 1974) The first of these "requires a showing that similarly situated individuals of a different classification were not prosecuted' United States of America, Appellee, v. Fadi Alameh, Defendant-appellant, 341 F.3d 167 (2d Cir. 2003 341 (quoting United States v. Armstrong, 517 U.S. 456,465 (1996) None of the 4 named co-conspirators or the 25 men with secret settlements were indicted.

H.    Prejudice and Materiality

This case was a 'she said, she said' case and because of the age of the proceedings and the lack of independent documentary corroboration, the witness credibility was at the core of every count, collaboration with financially interested lawyers fatally tainted the

trial. The resulting conflict constitutes a Bokun "fundamental defect." United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995).

I.    Conclusion on Point Three

By allowing private attorneys to function as de facto prosecutors and investigators and concealing that fact, the Government violated due process and *Brady*. The Court should vacate the judgment or order an evidentiary hearing or new trial.


POINT FOUR

Breach of the 2007 Non-Prosecution Agreement ("NPA") Violated the Fifth Amendment U.S. Const. amend. V.

A.    Overview –

From 2007-2019, the NPA was upheld by the Government. The United States breached the binding 2007 Non-Prosecution Agreement ("NPA") between the Government and Jeffrey Epstein, which extended immunity to "any potential co-conspirators" in a clause which was not geographically limited to SDFL and was separate from Epstein's. Petitioner was plainly within that class of "co-conspirator".

The subsequent SDNY prosecution therefore violated due process and the constitutional bar on arbitrary Government action revealed by new evidence. U.S. Const. amend. VI, Impartial Jury Clause, U.S. Const. amend. V, Due Process Clause. The Supreme Court has repeatedly said that the Due Process Clauses forbid arbitrary Government action. Procedural Due Process requires fair procedures to avoid arbitrary deprivation. [emphasis added]. Daniels v. Williams, 474 U.S. 327, 331 (1986): The Due Process Clause "*is intended to prevent Government officials from abusing their power, or employing it as an instrument of oppression.*"

B.    Governing Law

An NPA is a contract interpreted under contract principles informed by due process. United States v. Pollack, 91 F.3d 331, 334 (2d Cir. 1996); Santobello v. New York, 404 U.S. 257, 262 (1971). The DOJ, as one sovereign entity, is bound by promises made by any of its offices. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986). Plea Agreements are at the cornerstone of the US Criminal Justice System.

C.    Factual Background

The 2007 agreement barred federal prosecution of Epstein "and any potential co-conspirators." Internal DOJ memoranda later acknowledged that language protected "persons associated with Epstein's Palm Beach activities," including Ms. Maxwell EXHIBIT 81, the 2007 Non-Prosecution Agreement, was executed by the U.S.

Attorney's Office for the Southern District of Florida (USAO SDFL) on September 24, 2007.

For more than 11 years Petitioner relied on that assurance, residing openly in the United States. In 2019, amid public criticism, the DOJ reopened the matter without rescinding the NPA and indicted Petitioner on identical factual and temporal allegations involving Palm Beach complainants. The Government confirmed that the earlier investigation was the 'core of the case against the Petitioner' ( Dkt.93 at 12, July 14 2020) EXHIBIT 120. All Brady material relating to the NPA should have been given to Petitioner. The Government declined to search for any material relevant to the NPA (Dkt. 239 at 5) EXHIBIT 87 in spite of the court's order to give Petitioner any material that would support their arguments (Dkt. 207 at 5) EXHIBIT 86.

Intentional suppression is established by the Government's own decisions and omissions.

1. The refusal to search for any relevant material for the NPA (Dkt 239 p.5 EXHIBIT 87). The refusal to search for related material, knowing that such material existed, is itself intentional suppression. Courts have repeatedly held that a prosecutor cannot avoid Brady obligations by declining to look. See Banks v. Dretke, 540 U.S. 668, 696 (2004); Strickler v. Greene, 527 U.S. 263 (1999).

2. Villafaña's loss of notes and her destruction of notes is intentional destruction of exculpatory evidence—directly violating Arizona v. Youngblood, 488 U.S. 51 (1988) and California v. Trombetta, 467 U.S. 479 (1984). OPR 233 OPR 225 NOTE 338 EXHIBIT 35..

3. Acosta's internal emails in the key period are "missing"—which likely addressed the scope of the NPA and Main Justice's directives—constitutes intentional concealment of exculpatory and impeachment material.(OPR p. 287)

4. Failure to disclose OPR findings concerning Government misconduct is intentional concealment of classic Giglio material.

5. While assigning the case to the Public Corruption Unit is surprising in the absence of defendants or targets who are politicians or hold public office, or the public trust; assigning the case to Public Corruption Unit while disclaiming any knowledge of misconduct by the Government is internally inconsistent and evidences an effort by the Government to silo, firewall, or suppress damaging information that they must believe exists or the case would have been assigned elsewhere.

D.    Legal Analysis

Revocation of a relied-upon promise of immunity violates due process. Santobello, 404 U.S. at 262; United States v. Carter, 454 F.2d 426, 427 (4th Cir. 1972). Because the NPA was never rescinded for cause, SDNY's prosecution constituted a unilateral breach. Departmental estoppel applies: a promise by one U.S. Attorney binds others. Harvey, 791 F.2d at 300. The 2020 indictment—motivated by political pressure, not new evidence—was arbitrary and unconstitutional. See footnote 4 from US v Bravo )

E.    Prejudice

Had the promise made in the NPA been honored, Petitioner would not have been prosecuted or imprisoned. The Government's breach of its promise created a structural due-process violation; prejudice is presumed. Young, 481 U.S. at 807.

F. New Evidence

AG Barr accepted on 8/18/25 the terms of the co-conspirator clause of the NPA were ambiguous in other words it was not understood conclusively by its terms to be restricted to SDFL, the Government merely had a "good legal argument" that allowed the SDNY to prosecute the Petitioner namely, that the co-conspirators clause was not restricted to SDFL as argued. The SDNY could proceed with prosecuting the Petitioner openly because they had 'a good legal argument' (Barr Tr.87:1-3) EXHIBIT 25. But it was the same Government that destroyed and concealed the evidence that would have exposed their bad faith and wrong doing.

Acosta's silence - *Qui fassit videntur conscientere*

Acosta revealed to Congress that he was responsible for the NPA and not part of the negotiation team that negotiated the NPA (A.Tr.74:17-18) EXHIBIT 54. Acosta has remained silent as to the meaning of the co-conspirator clause for 18 years, silent even when questioned by the Inspector General. He stated that he had no idea why the co-conspirator clause broadened (A.Tr.84:10-13) EXHIBIT 54. He has never stated that the co-conspirator's clause was restricted to Florida. Acosta's silence implies ratification of the plain understanding of the words of the co-conspirators clause's global application. *Qui fassit videntur conscientere*. Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co., 152 F. Supp. 3d 159, 165. Acosta has throughout 18 years remained silent.

1.    Edwards (see fn 7) reveals multiple off campus meetings with Acosta during NPA negotiations (Uustal at 34.59) EXHIBIT 26 A "promise of genuine finality' was conveyed to Epstein's counsel in a meeting (OPR at 92) EXHIBIT 35, a reasonable inference would be that promises were orally conveyed and no other prosecutions in other districts for the same conduct with the same victims would ensue. This explains Acosta's silence and why 'the United States could not unwind the deal' as opposed to the SDFL per Acosta (OPR at 225 n.337)

EXHIBIT 35. Additional drafts were withheld from the Petitioner and would have informed her of the various iterations of global language in previous drafts and particularly the use of the United States language versus SDFL specifically. However, all of the drafts of the NPA were supplied to JKB nullifying claims of privilege. JKB at 159 EXHIBIT 15.

2. Acosta suggested that department policy prohibited him from binding other districts (Acosta.Tr.85;11-14) EXHIBIT 54 ignoring that the OPR found he had Plenary Authority (OPR at ix) EXHIBIT 35 and that the Justice Manual compels the opposite inference at 9-27.630) when it states that binding other districts must be explicit. Acosta ignores the subsequent severing of the co-conspirator clause from Epstein's restrictive clause (OPR at p. 74) EXHIBIT 35 and the co-conspirator's clause's geographic relocation below the 'federalized' section of the NPA which had no district restriction at all (OPR 266 ) EXHIBIT 35.

3. Acosta confirmed that there was contact with DOJ main (Washington) and that he was fully briefed before the NPA was signed (Acosta.Tr.17, 67;13-15, ), EXHIBIT 54, a direct contradiction to the Government's statements to the court during Motions in Limine and to the Court of Appeal. (Dkt 204 at 12) EXHIBIT 20. Acosta neglected to tell Congress that the final negotiations of the NPA were conducted by Lourie, the Principal Deputy Assistant Attorney General for the Department's Criminal Division and the Chief of Staff for the Assistant Attorney General in Washington D.C. (OPR at 69, 75) EXHIBIT 35. The Ashcroft Memo states a US Attorney or 'designated supervisory attorney' may authorize a plea that does not comport with policy (OPR at 138 n.207) EXHIBIT 35.

4. Acosta denied knowing of the existence of New York Complainants  (Acosta Tr.29:1-5) EXHIBIT 54 and claimed no knowledge of other states involvement (Acosta Tr.31:10-14) EXHIBIT 54, an identical argument made to the Appeal Court (Appeal Court Transcript at 12) EXHIBIT 82. However, per the OPR, Acosta was told that a complainant in New York had filed a civil suit against Epstein OPR at p 91 EXHIBIT 35 making it hard to square that Acosta had no knowledge of the NY complainants.

    (a) Edwards reveals the expanding New York investigation led to the creation of the NPA (HLN. Sex Ring Secrets: Exposing JE at 44.06m) (see footnote 7). EXHIBIT 83. JKB reveals the pressure the Government put on Epstein's businesses and employees in New York (Petitioner was an Employee of Epstein's. (Trial 263:16-21) EXHIBIT 124. The FBI traveled to investigate everywhere Epstein had homes (JKB Perversion of Justice at 144, 155) EXHIBIT 15 which further explains the push and need for the global co-conspirators clause to protect the New York Employees. The details of the expanding investigation into New York were concealed from Petitioner.

(b) The new evidence reveals that the New York investigation was the driver and motivation for the NPA and the co-conspirator clause, which contradicts Acosta's testimony. Acosta newly testified in 2025 that he was personally responsible for the terms of the NPA (Acosta Transcript 46:7-8) EXHIBIT 54 (Acosta Transcript 63:line 25, 64:line 1-12). The terms included the hybrid section of the NPA wherein the terms had "no district restrictions" (OPR p 266) EXHIBIT 35. By contrast the clause restricted to the SDFL relating to Epstein was not included in the hybrid section and deliberately kept separate. The co-conspirator clause was severed from the Epstein clause which is restricted to the SDFL and removed to the hybrid section which had no district restrictions. Had Petitioner received the many drafts of the NPA (as JKB did) it would have been clear as to the intent of the drafter as to why the co-conspirator clause was decoupled from the SDFL restricted language. Had the intent been to make the co-conspirator clause restricted to SDFL it could have simply been left where it was attached to Epstein's restrictive SDFL language.(OPR 74 EXHIBIT 35.) The Acosta assertion that he knew nothing of the expanding multidistrict investigation is inconsistent with the need for and creation of the NPA.

(c) At least 2 complainants from New York (not part of the Petitioners trial) revealed that they were interviewed in New York as part of Epstein's original investigation. Epstein hired an attorney for one indicating his knowledge of an expanding multi district investigation (See Jane Doe 84 ABC INTERVIEW 9/15/2025 "joint meetings with people" EXHIBIT 84  (Demonstrating the Governments lack of candor to the Appeal Court when asked if Epstein or Maxwell had awareness of investigations in other Districts (Court of Appeal at 12 EXHIBIT 82). See Danielle Bensky and Jane Doe 3 individually and on behalf of all other similarly situated v. Darren Indyke and Richard D. Kahn at P. 23 para 88 EXHIBIT 141 .

(d) Document 3501.018.017 at 3 EXHIBIT 128 reveals that New York continued investigating Epstein separate and apart from the SDFL. "Given the fact that there is the possibility that other minors are involved in the NY Territory investigation continues in this matter".

(e) Acosta testified to Congress that his edits were related to 'state action', (A.Tr:84:20-21) EXHIBIT 54 which rings hollow in light of the testimony given that he "restored" the global language. Acosta was responsible for 'restoring' the global language in the NPA in the final draft , unnecessary language if the terms in the NPA were solely related to SDFL indicating his awareness of the expanding investigation into other districts OPR at 84) EXHIBIT 35 The restrictive SDFL language was removed from the co-

conspirators clause which required his approval, indicating his awareness in the final draft.

J. Withheld Brady evidence

Acosta referenced 'multiple examples in the record' of Epstein's defense or Governments understanding of the NPA (Acosta.Tr.87:23-24) EXHIBIT 54. Petitioner did not receive discovery from the Government but rather from the OPR, from a limited public source. Epstein's Defense assertions regarding the NPA negotiations were *not included* in the OPR. (OPR at 55 n 90) EXHIBIT 35. The opinions expressed by the prosecution were without contemporaneous corroboration and constituted ex post facto rationalization to arrive at the desired result and often inconsistent. The USAO SDNY said there was no contact with the DOJ prior to Epstein signing the NPA (Dkt 204 at 12) EXHIBIT 20 contrary to Acosta's testimony. EXHIBIT 54. Clearly there is Brady material that was denied Petitioner (A.Tr.17, 67:13-15) EXHIBIT 54 . In the OPR, drafts of the NPA were sent to other supervisors that were not revealed (on information and belief supervisors in the DOJ Main) (OPR at 84) EXHIBIT 35.

1. Attached (EXHIBIT 128, 3501-018.017) reveals that New York investigated Epstein independently of the SDFL information that should have been revealed in a timely manner when the NPA was being argued, not years later and not buried in approximately 3 million + documents with a misleading headline

2. Drafts of the NPA, including those not in the public domain, where given to a journalist JKB. (JKB Perversion of Justice at 159) (see footnote 7) EXHIBIT 15. All drafts of the NPA, including those not in the public domain should have been disclosed to the Petitioner. The underlying drafts of the NPA are therefore no longer privileged and should have been disclosed. The co-conspirators clause was severed from Epstein's restricted clause and moved geographically to the hybrid section that had no 'district restriction' EXHIBIT 35 (OPR 266) There was previous global language that was removed and that Acosta later restored (OPR at 84) EXHIBIT 81. Drafts of the NPA and the negotiation history that would have allowed Petitioner to argue the legal points that Barr referenced and that Petitioner was denied and should have been disclosed. The Government should not have been permitted to withhold search terms regarding the NPA to conceal Brady material Doc 239 at p 5 EXHIBIT 87.

3. Edwards reveals that AUSA Villafana[15] rang him and instructed him to file the CVRA[16] (Uustal at 40.13) Exhibit 26 (a law of which Edwards had no previous knowledge, its sole goal, to nullify the NPA EXHIBIT 26.

4. AUSA Villafana's criminal defense lawyer made a statement that AUSA Villafana was effectively 'gagged' from speaking – prevented from telling the truth because of 'client attorney privilege, executive privilege and the privacy act'[17] information that would have helped Petitioner present a 'good legal argument' but was prevented by an improper assertion of privilege that had been waived by disclosure to third parties not covered by privilege. Client Attorney privilege that AUSA Villafana's attorney claimed is likely incorrectly applied as on information and belief this is applying to Edwards who was not disclosed as an agent, confidential witness/proxy of the government as early as 2008. The Government deliberately withheld disclosure of the NPA negotiation history and underlying documentation Docket 63 at 4 EXHIBIT 91.

5. AUSA Villafana's co-counsel described the co-conspirators clause as 'transactional immunity' that would have prevented the SDNY from prosecuting – No Brady disclosure regarding the basis for that statement made to the OPR was given to the Petitioner. EXHIBIT 35 Page 186 Note 258.

6. Senator Sasse, then a member of the Senate Judicial Oversight subcommittee said in a statement 'the crooked DOJ deal...shut down the investigation and protected his co-conspirators in other states'. EXHIBIT 78 Evidently, the senator had access to information that led to this statement that Petitioner never received.

Legal analysis

If the Government deliberately fails to disclose evidence, the standard is less demanding. US v Bravo *United States v. Bravo, 808 F. Supp. 311 (S.D.N.Y. 1992)*(if it can be shown that the government deliberately suppressed evidence a new trial is warranted if the evidence is merely material or favorable to the Petitioner.)

Even If the Court Does Not Find Intentional Suppression, the Government's Conduct Constitutes Reckless, Systemic, Constructive Suppression Under Kyles, Strickler, and Banks. Even assuming the Government did not act deliberately, its violations still mandate vacatur. The Government failed to satisfy its affirmative duty to learn of and

---

[15] Judge Marra in his opinion noted that 'the office' (SDFL) 'specifically directed' Edwards to write a letter to the prosecutors to challenge the NPA. On a preponderance of the evidence AUSA Villafana orchestrated and directed the filing of the CVRA in the same manner as he was directed to write a letter (Case 9:08-cv-80736-Kam Dkt 435 at19 ) EXHIBIT 42

[16] Edwards was the only Lawyer to whom AUSA Villafana was allowed to talk. (OPR at 232)EXHIBIT 35. Edwards in an affidavit confirmed AUSA Villafana called him June 30 2008 OPR 236 fn 367 EXHIBIT 35

[17] The former lead Federal prosecutor's attorney issued a statement. By James Hill and Pete Madden Aug 6 2019– EXHIBIT 89) .

disclose exculpatory information. Under Kyles, the prosecution must affirmatively search for favorable evidence held by any component of the Government.

The prosecution instead:

- conducted no meaningful search for NPA-related material,
- failed to obtain or review OPR and Public Integrity documents,
- failed to gather DOJ and SDFL internal communications,
- failed to investigate inconsistencies in DOJ's public statements,
- failed to obtain or preserve AUSA Villafaña's notes,
- and failed to reconcile DOJ's competing accounts of the NPA.

This is constructive suppression—a constitutional violation irrespective of intent.

The Government's "we did not look" stance is invalid as a matter of law. The Supreme Court has held repeatedly that "ignorance" caused by Government inaction does not excuse Brady violations:

- Banks, Banks v. Dretke, 540 U.S. 668, 696 (2004); . ("The State cannot hide behind a claim of ignorance.")
- Strickler, Strickler v. Greene, 527 U.S. 263 (1999) (Brady violation even where the prosecutor did not personally know of the evidence.)
- Kyles, Kyles v. Whitley, 514 U.S. 419 (1995), (obligation extends to evidence known to the police or investigative agencies.)

SDNY's refusal to search for NPA-related evidence—despite clear reason to know such evidence existed—cannot be excused.

The destruction of AUSA Villafaña's notes is itself a constitutional violation.
Under Youngblood, destruction of evidence with apparent exculpatory value is unconstitutional when done in bad faith.
Under Trombetta, even negligent destruction violates due process if the evidence was potentially exculpatory.

Whether deliberate or negligent, the destruction of the notes irreparably harmed the defense. The cumulative effect of systemic suppression undermines confidence in the verdict. Brady is violated if suppressed evidence, considered cumulatively, undermines confidence in the outcome. Kyles, 514 U.S. at 436–37.

The suppressed evidence here includes:

- destroyed notes,
- withheld DOJ communications,

- undisclosed OPR materials,
- unsearched discovery repositories,
- internal inconsistencies in DOJ's treatment of the NPA and "co-conspirators,"
- and Government knowledge of its own misconduct.

The cumulative effect is overwhelming and requires vacatur.

## CONCLUSION

Whether viewed as intentional suppression or reckless, systemic constructive suppression, the Government violated Petitioner's rights under:

- Brady,
- Giglio,
- Napue,
- Kyles,
- Strickler,
- Banks,
- Trombetta, and
- Youngblood.

The conviction must be vacated.

Acosta's Silence –

Acosta's silence implies ratification, he has been silent as to meaning of the "co-conspirator's clause for 18 years. Qui fassit videntur conscientere. Acosta's has throughout remained silent and one can only conclude that he has remained silent because the co-conspirator clause was intended to be global.

Annabi Exception

The New York courts analyzed the NPA under Annabi *United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985), case law that does not apply in some other jurisdictions in the United States indicating that New York was selected to prosecute the Petitioner (based on the new evidence ) in a type of forum shopping that is widely rejected in the common law.

An exception to Annabi exists if there is evidence to show a prosecutor was attempting to evade its own obligations under the plea by transferring a prosecution. US

v. Salameh 152 F3d, 120 (2d Cir.1998). Evidence reveals that the prosecutors circumvented the plea when they successfully transferred the prosecution to New York.

1. Edwards reveals that AUSA Villafana[18] (see also fn 15, 16,17) rang him and instructed him to file the CVRA[19] (Uustal at 40.13) Exhibit 26 (a law of which Edwards had no previous knowledge, its sole goal, to nullify the NPA EXHIBIT 26. AUSA Villafana used Edwards as a proxy and conspired with him to overturn the NPA by instructing him to file the CVRA, before the ink was dry. This demonstrates that the Government negotiated the NPA plea deal in bad faith (Uustal at 40.13) EXHIBIT 26.

2. AUSA Villafana coordinated with Journalist Churcher and Plaintiffs' Lawyer Edwards to interview Guiffre for inclusion in the CVRA in 2011. (See fn 16). (Guiffre had been recognized as a victim under the NPA in 2007 and paid restitution and under the terms of the NPA (EXHIBIT 35 OPR at 147 fn 217). Giuffre could not re prosecute Epstein - the plea precluded it in Florida- her 2011 interview utilized for CVRA. Edwards wrote about continuously taking victims for inclusion for the CVRA to AUSA Villafana (BE Relentless Pursuit at 221-222) . EXHIBIT 14 JKB wrote about the number of times the lawyers went to New York to instigate a new investigation (JKB. 282) EXHIBIT 15

3. Victims that were identified under the SDFL investigation were encouraged to contact the SDNY in 2013 (and other districts) to re-prosecute Epstein, and SDFL offering to share Grand Jury and other evidence. (Jane Doe 1 and Jane Doe 2 v.US 08-cv-80736 (S.D.Fla July 4th 2013). EXHIBIT 147

4. In 2016 plaintiff's lawyers told the SDNY that the SDFL wanted to pursue an investigation (Dkt.285-1 at 8) EXHIBIT 24. Proposed charges (Dkt.285-2 at 2) EXHIBIT 22. The AUSA noting SDFL unhappiness as a factor in reopening the investigation (Dkt .285–2 at 3 .) EXHIBIT 22. The documents presented to the SDNY were directly related to and created from the 2011 meeting with AUSA Villafana and Churcher, Edwards and Giuffre for use in the CVRA case to overturn the NPA and presented to SDNY in 2016 for use in a future criminal prosecution of Petitioner (DKT 204-6) EXHIBIT 23. Noting that doing so would help the CVRA case (id at 6) EXHIBIT 22. At 2016 meeting documents that were directly related to and created from the

---

[18] In Radar ONLINE v FBI the Government admits having extensive documentation withheld under Attorney – Client privilege normally applying in civil suits. On information and belief this privilege was asserted to shield actions between Edwards and AUSA Villafana including but not limited to finding asset information see Dkt 38 10/29/21 filed at p 23-24. Villafana was gagged under attorney client privilege, and the privacy act and executive privilege (see fn17) .

[19] Edwards was the only Lawyer to whom AUSA Villafana was allowed to talk. (OPR at 232)

2011 meeting with AUSA Villafana and Churcher and Edwards for the sole
purpose of overturning the NPA through the CVRA presented Guiffre's
CVRA documents to entice the SDNY to investigate and prosecute. (Dkt.204-
6) EXHIBIT 23.

Intentional suppression violates clearly established Supreme Court precedent.
Under Brady v. Maryland, 373 U.S. 83 (1963), the State must disclose all favorable
evidence. Under Giglio v. United States, 405 U.S. 150 (1972), impeachment evidence is
included. Under Napue v. Illinois, 360 U.S. 264 (1959), the Government may not permit
false or misleading impressions to stand, nor conceal information that would correct
them. Under Kyles v. Whitley, 514 U.S. 419 (1995), the prosecution has an affirmative
duty to learn of and disclose exculpatory materials within any "arm of the Government."

The prosecution violated all four rules.

Intentional suppression is established by the Government's own decisions and omissions

1. The refusal to search for NPA-related material despite having reason to know
   such material existed is itself intentional suppression. Courts have repeatedly held
   that a prosecutor cannot avoid Brady obligations by declining to look.
   See Banks v. Dretke, 540 U.S. 668, 696 (2004); Strickler v. Greene, 527 U.S. 263
   (1999).

2. AUSA Villafaña's destruction and suppression of notes is intentional destruction
   of exculpatory evidence directly violating Youngblood and Trombetta. (OPR 225
   n 338, 233) EXHIBIT 35.

3. Withholding Acosta's internal emails—which likely addressed the scope of the
   NPA and Main Justice's directives—was intentional concealment of impeachment
   material.

4. Failure to disclose OPR findings concerning Government misconduct is
   intentional concealment under attorney client privilege, executive privilege, and
   the privacy act (see fn 17) of classic Giglio material.

5. Assigning the case to Public Corruption Unit while disclaiming any knowledge of
   misconduct is internally inconsistent and evidences an effort to silo, firewall, or
   suppress damaging information.

D. The prejudice is overwhelming

Had the defense received:

- the NPA negotiation notes;
- Acosta's internal communications;
- DOJ interpretations of "co-conspirators";

- OPR findings;
- proof that DOJ viewed Maxwell as within the protected class in 2007–08;
- evidence that DOJ reversed its position only after Epstein died in federal custody—

the cross-examination of the Government would have been fundamentally different.

The trial would have been fundamentally different.

The outcome is unreliable.

Vacatur is required.

F.    Conclusion

THE SDFL did not like the deal they made with Epstein and sought to circumnavigate the NPA before the ink was dry. Working with plaintiff's lawyers for 12 years to circumnavigate the plea and obtain additional evidence through civil suits and promote an investigation. The Government sought to hide their bad acts by erecting a fence of privilege, attorney client privilege, executive privilege and the privacy act which shocks the conscience, The Court should vacate the indictment and conviction or order an evidentiary hearing to determine the binding scope of the 2007 NPA.


POINT FIVE

Fabrication and Misrepresentation of Physical Evidence (Massage Table and Related Materials) and Exhibit 52, the address book


A.    Overview

The Massage table was improperly admitted at trial in the absence of proper identification and authentication by a witness. The Government relied on Parkinson whose testimony, based on the newly discovered Grand Jury testimony, appears un-supported.

Trial Exhibit 52, the address book was admitted, although not authenticated by any witness, allowed in, improperly by the Court not for the truth. Further, the Government failed to disclose Edwards' involvement as a Confidential Informant involved in its "production".


B.    Governing Law

Due process forbids conviction through false or misleading evidence. Napue v. Illinois, 360 U.S. 264 (1959); Mooney v. Holohan, 294 U.S. 103 (1935). When the Government fails to correct false testimony or admits fabricated evidence, the conviction must be set aside if there is any reasonable likelihood it affected the verdict. United States v. Agurs, 427 U.S. 97, 103 (1976).

C.     Factual Background

1.The Gov newly revealed they had documents of confidential information Radar ONLINE v FBI Dkt 38 p 26-28 EXHIBIT 67. The Government did not reveal any confidential information. The Government did not reveal Edwards as the confidential informant who "discovered" and produced Trial Exhibit 52 and the Government declined to review the investigative files regarding the production of Trial Exhibit. 52 as they alleged they 'lacked relevance'. (Dkt 63 :4 n.3) EXHIBIT 91

2.The Government presented the massage table as originating from Epstein's bathroom and bearing a "Made in California" label to establish interstate commerce. Subsequent document releases, photographs and forensic analysis of the adhesive reveal that the exhibit's provenance was questionable and that the chain-of-custody records may have been altered. Radar On Line vs FBI Vaughn Index (Exhibit 46).

Trial Exhibit 52.

1.  Trial Exhibit 52, the address book, from new reporting, was produced by a confidential informant a fact not revealed by the Government to Petitioner. Edwards discusses his role as a CW in production of Trial Exhibit 52 (Uustal at 1.28.00) EXHIBIT 26

2.  The admissibility and authentication of Trial Exhibit 52 was litigated pre and during trial and finally 'admitted not for the truth'. Petitioner requested a mistrial based on Governments use of and the government statements regarding in their closing argument Ex. 52 (Tr. 2910:5-25, 2911-2912:1-12) EXHIBIT 121. As a result of the Jury instructions and the Governments closing arguments we know from subsequent press interviews that the Juror's relied upon Exhibit 52 "for the truth" making a wrong inference – that the Trial Exhibit showed how the petitioner evaded accountability in the first investigation. The Independent Jan. 4th 2022 EXHIBIT 5 and how the list of masseuses was important in linking the Petitioner to the complainants (Paramount +The verdict is it over Ep 4 at 38.09) EXHIBIT 7.

3.  In new reporting Edwards stated that Alfredo Rodriquez , had no responsive documents in a deposition taken by Edwards (ILP part 2 at 16.08) EXHIBIT 19. The Government, in its criminal complaint against Rodriquez , wrote the "CW was present for 2 depositions and denied having responsive documents to the subpoena (Criminal complaint at case 9:09-mj-08308-LRJ Dkt3 page 2. point 5)

EXHIBIT 122. Both statements are false Rodriquez told Edwards he had responsive documents in his first deposition, and Edwards stated that they would have to return for a second deposition. (Deposition Rodriquez 29th July 2009 p.245) EXHIBIT 95 . The documents Rodriquez ultimately produced in his deposition became Exhibit 52).

4. The importance of the lie reveals that Edwards had access to Exhibit 52 for approximately 3 months before he contacted the FBI; a period of time in which Edwards's 'boss' was  creating fake settlements relating to the Epstein case for millions of dollars (Uustal at 1.28.00)  EXHIBIT 26. This was at the same time Mr. Edward's firm Rothstein Adler was creating fake settlements that were to be used to extort various billionaires Rothstein December 22, 2011Deposition EXHIBIT 109.

5. JKB (see fn 7)  wrote that Petitioner only 'compiled' portions of Trial Exhibit 52 -- in other words was not written by the Petitioner JKB Perversion of Justice at 318) EXHIBIT 15.

6. The Government knew or should have known that Trial Exhibit. 52 was not the Petitioners, nor was it written by her , that the "address book" did not reveal her knowledge, intent  and guilt  because the 'address book' was not hers and not authored by her as the Government improperly argued at closing (Tr.2881:1-2, 2884) EXHIBIT 92 .

7. The Government used witness Alessi to authenticate the book when the Government knew (or should have known) that the book was not the same as the one's in Epstein's house at the relevant period – because witness Alessi stated that the book the Government showed him was" not the same size or written in the same font"  - the Government allowed him to perjure himself stating it was the same as those from Epstein's house (Tr.2881:14-15) EXHIBIT 92. Alessi testified that the books he recalled neither matched Trial Exhibit.52 in size nor font. (Tr 828:4-6, 851:20-22). EXHIBIT 93

8. At trial he 'has no personal knowledge', the books he recalled were a different size with a different font. (Tr.823: 828:5-6, 851:)  EXHIBIT 93 inches thick and the size of a large telephone book - demonstrably this was not descriptive of the Exhibit 52 produced by the Government at trial. Contradicting Government testimony Tr:2881:14-156 EXHIBIT 92

Massage table

1.      Parkinson testified he 'seized' Epstein's massage table from  EPSTEIN'S bathroom in his Palm Beach residence (TR.1089 line 10-14) EXHIBIT 106. However, his grand-jury testimony, released in 2024, and not seen by Petitioner prior to 2024,  shows he did not identify Epstein's table from his bathroom with a shower, but a different table

in an adjacent bathroom with a tub. (Parkinson GJ 110:5–24.) EXHIBIT 11. Carolyn, the sole witness to Courts 5 and 6, described the location of Epstein's massage table which was in a bathroom, with a steam room and a shower, no tub, (Tr 1521:18-25, 1522:1-12 EXHIBIT 12 . Parkinson was not truthful and the Prosecutors knew or should have known that when he said he seized the massage table this was a lie.

2.      Altered Chain of Custody. Newly released Police property sheets show discrepancies in serial numbers and collection dates for the seized table. The massage table exhibit introduced at trial (Tr. 2893-2895) EXHIBIT 92 bears a different evidence tag than the inventory list signed by Det. Parkinson. No contemporaneous photograph matches the items displayed to the jury.

3.      Mischaracterized Labeling. The "Made in California" sticker relied upon to satisfy interstate commerce was applied post-seizure; photographs taken during the 2005 raid show no such label.

4.      On information and belief a Suppressed Forensic Report referenced in an internal FBI laboratory memo (2024 FOIA Radar on Line release Exh. E) states at paragraph 3 that adhesive residue suggested "recent affixation" inconsistent with 2005 manufacture. This report was never disclosed to the Petitioner. EXHIBIT 46 Vaughn Index

5.      Inflammatory Use. The prosecution repeatedly referenced the table as a "symbol of Maxwell's participation," appealing to emotion rather than fact that the table exhibited had questionable provenance and date of production. (Tr. 3021:18-25) EXHIBIT 92.

6.      The Government repeatedly mischaracterized the table as "the one " that Carolyn was abused on (Tr.2894;25, 2895:1-4) EXHIBIT 92. This is inconsistent with the Grand Jury evidence of Parkinson as discussed above and the suppressed forensic report referenced above.

Prejudice - The Massage Table and Trial Exhibit 52

The massage table was the 'linchpin' for proving interstate commerce. Without it, Counts 5 and 6 collapse. The unauthenticated evidence therefore affected the verdict.

Trial Exhibit 52

Alessi's was the sole authenticator for Ex 52 and his evidence was perjurious. Alessi testified that he recognized Ex. 52 as one of those books from Epstein's house (Tr. 2881:14-15) EXHIBIT 13 this was a lie exposed by his previous statements in which he stated Trial Exhibit 52 at trial was smaller and not written in the same font as the books he remembered TR 828 4-6, 851 20-22 EXHIBIT 13.

The Jurors made the wrong inference from the address book. Juror #50 stated in his Independent Interview Jan 5 2022 EXHIBIT 5, that the address book Scotty David said "the little black book also gave the jurors clues about how Maxwell and Epstein had

evaded accountability in the past. There were names of several Palm Beach police officers listed on a first-name basis in that book", David said.

D.    Legal Analysis

Introducing evidence known to be unreliable violates due process. Napue, 360 U.S. at 269; United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006). The concealed FBI memo was Brady material because it impeached Parkinson's authentication and undermined the Government's jurisdictional theory. The combination of falsified chain-of-custody and misapplied labeling rendered the exhibit inadmissible under Fed. R. Evid. §403 (unfair prejudice). Concealing that Edwards was a confidential informant involved in the production of Exhibit 52, the address book, was as well a Brady violation. The government then forced Alessi to authenticate an exhibit in contradiction to his earlier statements under oath. Previously, under oath he had stated both that he recognized Ex 52 and that he did not recognize Ex 52 namely the font and the size of the book. The two statements cannot be truthful.

E. Governing Law

Under Napue v. Illinois if the Government knowingly uses perjured testimony or fails to correct false testimony a defendant's due process rights are violated. Under US v Butler 955 F.3d 1052, 1053 (D.C. Cir. 2020 and US v Ausby, 916 F 3d 1089,1092 (DC Cir 2019) such conduct if proven can provide independent basis for relief under §2255.

F.    Conclusion on Point Five

We know from the press interviews with the jurors that these errors did affect the verdict (EXHIBIT 5) because the Government presented falsified and misleading physical evidence, they permitted Alessi and Parkinson to perjure themselves, and suppressed contradictory forensic reports, and concealed Edwards's role as a confidential informant Petitioner's conviction must be vacated or remanded for an evidentiary hearing.

POINT SIX

Mischaracterization of Property, Asset, and Financial Evidence Violated Due Process

The Government protects their source of its asset tracing under attorney client privilege Radar OnLine v. FBI  Dkt 38 p.24) EXHIBIT 76. JKB (see fn7) writes that it was Edwards who asked the Court to appoint a receiver to take control of Epstein's assets JKB Book, Perversion of Justice, p.166, EXHIBIT 15. The Government admitted in Radar Online (id) that it had asset information, information not given to Petitioner in discovery.

The asset sheet, is expected to reveal when Epstein purchased 71st Street and completed the extensive renovation and moved in in 1996; and that the Santa Fe house did not exist

at the time Jane testified she was abused there undermining her credibility. It did not exist until 1999/2000.\* The Palm Beach house was shut for extensive renovations revealing that Jane's memory of events that she recounted with specificity at those homes could not have occurred as she recalled, the new evidence would have undermined her credibility.

Further the Government pointed to a helicopter as the property of Petitioner because the entity holding title was named "Air Ghislaine". The corporate entity, other than sharing a common name , was not under the control of Petitioner. The asset sheet if properly and accurately compiled would reveal 100% control of the helicopter by Jeffrey Epstein.

A.    Overview

The Government misrepresented Petitioner's legitimate business transactions and property holdings to create an appearance of illicit gain. By portraying ordinary accounts and trust structures as instruments of crime—without factual foundation—the prosecution misrepresented material facts and violated due process and the rules of evidence.

B.    Governing Law

Convictions obtained through materially misleading financial evidence violate the Fifth Amendment. Mooney v. Holohan, 294 U.S. 103 (1935); United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006). Evidence must be relevant and not substantially more prejudicial than probative. Fed. R. Evid. 403.

C.    Factual Background

Trial testimony suggested that Petitioner "co-owned Epstein's properties" and co-owned Epstein Jet (SH:44:1-9) EXHIBIT 52 and "derived income from victims' exploitation." In fact, contemporaneous deeds, bank records, and U.K. filings EXHIBIT 111  show that the assets were either Epstein's or held by foreign trusts unrelated to Petitioner and not derived from any of the alleged offenses. The Government's charts mis-dated transfers and omitted exculpatory notations showing repayments or gifts.

Additionally, an FBI summary presented as "Maxwell's account ledger" (GX 1453) was actually compiled by third-party civil counsel. The omission of source attribution misled the jury into believing it was an official Government document. New reporting shows that it was the plaintiff's lawyers who collected the financial data (JKB 166) EXHIBIT 14. There was no proof that the government checked or corroborated the work of the third party financially interested and financially motivate civil plaintiff's lawyers.

D.    Analysis

Where prosecutors introduce incomplete or distorted summaries, they must correct the record. Napue, 360 U.S. at 269. Failure to do so deprives the defendant of a

fair trial. The presentation of foreign trusts as criminal proceeds also constituted amendment of the indictment by expanding its scope to uncharged conduct, contrary to Stirone v. United States, 361 U.S. 212 (1960).

E.    Prejudice

The misleading financial narrative inflamed the jury and suggested wealth as evidence of guilt and a benefit of criminal conduct. Such prejudice goes to the heart of due process.

F.    Conclusion on Point Six

Because the Government knowingly misrepresented property and financial evidence, the judgment should be vacated or, at minimum, remanded for a hearing on prosecutorial misconduct.


## POINT SEVEN

Amendment of Counts Three and Four

A.    Overview

Counts 3 and 4 of the indictment were effectively broadened at trial beyond the grand-jury charges, violating the Fifth Amendment's Grand Jury Clause when the judge refused to clarify or respond to a jury question.(TR 3140 AT 20; 3141 AT 3) EXHIBIT 134 Juror#50 newly revealed jurors were *"confused"* on legal interpretation of the law and on definitions (Reuters Jan 5 2022).EXHIBIT135 The judge was confused by the note and refused to clarify the juror's question or respond meaningfully (Tr 2759-2760). NOTE 3037 LINE 10-19.DKT 593 EXHIBIT 136 (Transcript 3126 line 16-21) EXHIBIT 137.

The Mann Acts had to be based on an intent to violate New York Law (Tr. 68:2-4. 277:3-6) EXHIBIT 74 flights had to be to New York. The Government argued that there was no need to add 'Florida to New York' to avoid the suggestion of a variance (Dkt 565 at 22) EXHIBIT 137.

Activity in New Mexico was not sufficient to convict on the Mann Act Counts. The Judge specially instructed the jury that Jane could not be considered for Count 4 (Transcript 3028, 3036-3038 EXHIBIT 137.

B.    Governing Law

Jurors sought to clarify in relation to Count 4 the law when they sent the judge two questions (Transcript 3126 line 16-21)(EXHIBIT 137   ) a question regarding "enticement" and a question regarding "travel from New Mexico" (EXHIBIT137) Juror #50 revealed the Jury was confused on terms such as "enticement", the law and per the

note Jane's travel from New Mexico. The Court failed to assist the Jurors out of their confusion particularly by not reminding the Jury that "Jane was not the minor identified in Count Four and you may not rely on her testimony as the basis for that Count" and as we now know from the new evidence the Court's failure to clarify and relieve the confusion of the Jury resulted in the Petitioner's conviction on that Count.

It is crucial when a Jury seeks clarification or an explanation of the law that (s)he gives a statement that clarifies or helps the jury out of their confusion. Kopskin 757 F.3d 168, 172 (2dCir. 2014) expanding timeframe and elements' (Tr 4213:18 -4222:7) (To the best of Petitioner's knowledge and belief as Petitioner no longer has access to these transcripts and relies upon notes.) The Government argued that there was no need to add 'Florida to New York' to avoid the suggestion of a variance in Juror instructions (Dkt 565 at 22) EXHIBIT 137. The lack of clarity allowed a constructive amendment to occur modifying the essential elements of the offense charged because the jurors were confused. United States v. Miller, 471 U.S. 130 (1985); United States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012). Such error is per se reversible. Stirone v. United States, 361 U.S. 212 , 217 (1960).

C.    Factual Background

The confusion permitted a conviction based on 'related conduct'

Counts 3 and 4 alleged conspiracies to entice and transport a minor between 1994–1997. At trial, the Government argued that "decades-long grooming" continuing into the 2000s satisfied the counts. Jury instructions permitted conviction based on "related conduct," effectively expanding the time frame and elements and the refusal to alleviate the confusion of the jury allowed them to make an unsafe verdict. (Tr. 3139, 3140:1-18) EXHIBIT 94.

D.    Analysis

Juror #50 revealed the Jurors confusion – they did not understand terms such as 'enticement' and that the instructions were confusing. EXHIBIT 122 January 5th 2022 (Trial Transcript 3140:10-14) EXHIBIT 135.

By allowing the conviction for conduct not charged and not clarifying the jurors' confusion, the Court constructively amended the indictment. See United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996). The alteration of temporal and jurisdictional elements deprived Petitioner of notice and her right to a grand-jury determination. The Court's comment was "I don't know what the note is asking factually or legally." (Trial Transcript 2137:14-17) EXHIBIT 73

E.    Conclusion on Point Seven

Because the jury instructions, and the judge's failure to address the juror confusion, evident with their note, the jurors in their confusion broadened the indictment's scope, the convictions on Counts 3 and 4 must be vacated.

POINT EIGHT

Pre-Indictment Delay and Tactical Advantage

A.     Overview

The Government's 25-year delay between alleged conduct and indictment violated due process by impairing Petitioner's ability to present a defense and is revealed by trial testimony and new evidence. The Government had multiple opportunities to indict Petitioner in a timely manner years sooner. Pre indictment delay was raised pretrial -- the court denied the dismissal of the charges but stated the issue could be re litigated post-trial (Dkt.317 at 10) EXHIBIT 101).

1.  The House Judicial Committee on Oversight reveals the Government had notice of Petitioner in 1997 (Acosta Tr. 31:1-2) (EXHIBIT 54).
2.  Epstein was investigated from 2005. Complainant Farmer gave a detailed 302 interview in 2006 which was used at trial (Tr 2209:19-25, 2210:1-12) EXHIBIT 73
3.  Non-Testifying Witness Giuffre was contacted by the Government in 2007, noticed as a victim under the NPA and paid restitution. (OPR 147 n 217).EXHIBIT 35
4.  2008 the SDNY independently investigated Epstein and co-conspirators (3501.018-017) (EXHIBIT 128) AUSA Villafana used Edwards as a proxy and conspired with him to overturn the NPA by instructing him to file the CVRA-before the ink was dry on the NPA. This demonstrates that the Government negotiated the NPA plea deal in bad faith (Uustal at 40.13) EXHIBIT 26.
5.  2011 GIUFFRE gave detailed allegations to the Government that included allegations against the Petitioner which were used for the CVRA. EXHIBIT 126)3501.226.030
6.  2013 SDFL invited other Districts to investigate offering to provide evidence from SDFL investigation Jane Doe 1 and Jane Doe 2 v US 08-cv-80736 (S.D. FL) July 5 2013 Dkt 205-2 at 9.10. 10.9) bail bearing doc page 10 note 9-10 CVRA Dkt 205-2 at 9 EXHIBIT 143 Steptoe Letter document 6 page 7-8 EXHIBIT 142
7.  In 2016 Plaintiff's Lawyers met with SDNY to instigate an investigation into Epstein (see fn 9). Plaintiffs Lawyers tried to incite  the Government to re-open its criminal investigation on multiple occasions (JKB at 282 . EXHIBIT 15. In 2015 Giuffre filed detailed allegations against the Petitioner and filed a defamation case and went to the SDNY to incite criminal investigation.

8. The intervening years were used to exploit the civil litigation process to gain a tactical advantage, using plaintiffs' lawyers in the front and behind the scenes to defame Petitioner in pleadings working the media promoting "fake news" falsely portraying her and Epstein as one person whilst working to invalidate/overturn the NPA using the CVRA as litigated in POINTS THREE and FOUR set forth above. Edwards acted as the proxy for AUSA Villafana both conspiring to overturn the NPA thru the CVRA litigation. (Uustal at 40.13 ) EXHIBIT 26. Obtaining police records and victims' names from law enforcement and USAO Florida AUSA Villafana sharing information with potential claimants, using the information for "secret" settlements with men with deep pockets in exchange for keeping the identity of those men out of the public arena to benefit the personal pocketbooks of plaintiff's lawyers. In 2008 AUSA Villafana directed Edwards to file the CVRA case, its sole aim to overturn the NPA (Uustal 40.13), EXHIBIT 26. The CVRA became a tactical tool that allowed the Government to keep investigating Epstein and the co-conspirators through civil litigation and discovery. The ongoing litigation allowed continued press collusion to push a false narrative through friendly journalists like Sharon Churcher and JKB see footnotes 8 and 9 and 11 above turning Petitioner into an object of 'rage bait'[20].

9. AG Barr admitted that post Epstein's death they were looking for someone to indict for trafficking (Barr Tr. 58:18-19 EXHIBIT 25. The Petitioner was not named in Epstein's first or second indictment, 4 other women were named as co-conspirators but none of the four were ever charged. The Government could have indicted the 4 named co-conspirators, or any of the 25 men that settled secretly with the Plaintiff's lawyers for the complainants (see footnote 10) but did not.

10. In 2016 the plaintiff's lawyers met to instigate an investigation into the Petitioner (see fn 9)

DOCUMENTS LOST OR DESTROYED BY THE GOVERNMENT

1.AUSA Villafana ordered lists of victims and their statements to be destroyed (OPR p. 233) EXHIBIT 35 .

2.Acosta emails were 'lost' (OPR p.323) EXHIBIT 35 The emails would have revealed that emails between Acosta and Epstein's defense regarding the negotiation of the clauses of the NPA and that the co-conspirators clause was intentionally intended to be global, thus precluding the SDNY from indicting the Petitioner

3. Interview notes with victims are missing and incomplete (OPR at 222 n.338) EXHIBIT 35

---

[20] Oxford English Dictionary 2025 Word of the Year, 'rage bait' – 'online content designed to provoke anger or outrage to increase engagement on social media and the internet'

4. JKB quotes Det. Recarey who was in charge of the Palm Beach investigation stating that evidence was lost and destroyed (JKB at 137) EXHIBIT 15.

DEAD WITNESSES

1.Epstein. His Death denied Petitioner critical documents to defend herself to include for example full flight manifests. EXHIBIT 70

2.Epstein had access to the negotiation history of the NPA which was conducted by his lawyers on his behalf. Acosta Tr p87 lines 23-24 EXHIBIT 54 ; OPR p55 at fn 90 EXHIBIT 35. Epstein was arguing the intent and his understanding of the NPA at hail and in limine which would have precluded the indictment of Petitioner after Epstein's death. As an example in the Epstein proceedings, the following exchange between Weingarten, Counsel for Epstein and the Court gives insight into what Epstein had in relation to the NPA that was never disclosed to Petitioner (Transcript August 29, 2019 page 15 et seq EXHIBIT 148

> *"MR. WEINGARTEN: We interviewed all of the relevant lawyers on the defense side who participated in the NPA, and we were satisfied that we had a very strong argument that every one of those lawyers believed with an objective hasis that the deal was global. That is, at the time*
> *THE COURT: I'm sorry, that?*
> *MR. WEINGARTEN: The deal of the NPA was global. That is, more specifically, at the time, the Florida prosecutors and agents knew of conduct in New York, and that no competent defense counsel negotiating in good faith with the prosecutors would have ever agreed to a deal back then that allowed New York prosecutors to indict for precisely the same conduct in the future, which, of course, is what happened. In addition we have come up with very powerful evidence we believe, that Florida prosecutors, who participated in the deal, steered the victims and the alleged victims to new ork on more than one occasion because they did not want to suffer the sleights of attacks against them. So we have advanced the ball on this very subject and we are prepared to completely report to the court as to where we are and what we've done. "*

3.Epstein would have given evidence that Petitioner was not involved in criminal behavior (Netflix. at 56.09 m) EXHIBIT 27. Confirming that he had wanted to be the sole person to take responsibility for his criminal behavior ( OPR p 167. EXHIBIT 35).

4.Epstein would have presented documentary evidence and testified that he did not live in or have guests in 71st St, New York House until after renovations were completed 1996 (TR 2710-2719) EXHIBIT 80 as stated in a civil deposition of Epstein's not admitted at trial. Government witness' Dave Rogers, and Annie Farmer stated that J Epstein moved into 71st St in 1996 and that the house of under renovation until 1996(Tr 1948:2). EXHIBIT 71. This would have undercut Jane's credibility as she could not have been abused in a house, when she stated, at the age she stated, that Epstein had under renovation and neither owned nor lived in between 1994-1996.

5.Epstein would say that the New Mexico 'Huge' house as described by Jane where she testified she was abused, at age 15 years of age, did not exist until 4 years later when she would have been at least 19 years of age. (TR 518:10-13) EXHIBIT 107. New Mexico was finished approximately at the end of 1999 to beginning of 2000 (TR 238: 8-11) EXHIBIT 124.

6.That Palm Beach was under major renovation and, JE rented and lived in a separate house during the duration of the renovations and construction. Janes' specific testimony of abuse at his Palm Beach house in 1994-1995 could not have occurred as described as the house was under renovation and had no utilities, and no water, during that period. (TR 1945:18-21, 1946: 1-3) EXHIBIT 71. The pilots gave evidence as to the renovation in the time period. (TR. 254:12-13, 255:1-6)

7. Albert Pinto was the decorator of Epstein's properties and would have corroborated the status of the properties on particular dates making the evidence and the alleged ages of the complainants not possible but Mr Pinto was deceased by the time of trial.

8.Recarey- Det Recarey served as lead detective in charge of the first investigation of Epstein. Recarey would have evidence that the Petitioner was not involved, did not sleep in the master Bedroom (P.GJ 112:19-23) EXHIBIT 11; that sex toys were purchased by named co-conspirator ▮▮▮▮ (R GJ 70:19-21 EXHIBIT 129 that Petitioner had her own room in Epstein's Palm Beach House undermining the Governments main argument that the Petitioner and Epstein were living together as a couple as late as 2005. Recarey was deceased by the time of trial. Recarey would have contradicted the governments closing stating that Petitioner was Epstein's girlfriend in 2005 and co-habitating with Epstein. Petitioner was not.

Witness Tampering and influencing/poisoning memories of witness-

The time delay allowed witnesses to compare and then align their evidence through joint meetings with each other and their therapists[21].

Government witnesses were not clear on timelines of events or dates (TR 999:18-21) EXHIBIT 106

1. Alessi: Giuffre visited Alessi at his home pre trial to 'get him to testify' . Giuffre discussed witness Jane with him (See Footnote 12) contaminating the timelines and age of Jane at the relevant times. Giuffre's interference with Allessi's evidence is evident in the following descriptions of Jane. Jane described herself as small and flat chested until she turned 16. (TR 325:4-5) EXHIBIT 124 Alessi remembered her as tall (TR 835:16) EXHIBIT 93. Visoski recalled that she was

---

[21] "I began working with survivors of Jeffrey Epstein in 2007. I had two survivors referred to me by the FBI. And then I had the opportunity of getting to know some of the attorneys in the area who were working with victims, who referred more victims to me. I have treated survivors who have been manipulated by Ghislaine." (Netflix at 42.36) Randee Kogan

mature, well developed (TR 218:7-10) EXHIBIT 124. Alessi testified he met Jane when she was 14 in 1994 (Tr 839:3-4 ) EXHIBIT 93. The evidence of Alessi does not comport with the evidence of the pilot Visoski or Jane herself. Prior to Giuffre interfering Allessi said only that he met Jane in 1998 or 2000 in deposition when Jane would have been 18/19 years of age. Giuffre's interference with Alessi unnecessarily confused critical evidence. The Court did not permit Alessi's deposition evidence to be heard. TR 952-967 EXHIBIT 110.

2. JANE : Jane reported she was blackmailed (TR 607) EXHIBIT 107 her story was used against her will to bolster Giuffre's CVRA case. (See footnote 12) The delay in charging Petitioner allowing witness interference and coercion and use of threats. That allowed Giuffre to interfere with Jane's evidence.

3. Jane stated in evidence that the FBI wrote everything down wrong and that the timeline of events was wrong (Trial Tr 506:16-20) EXHIBIT 62. She could not recall the house she lived in (Trial Tr 380:16-25, 381:1-7) EXHIBIT 124. This would have revealed that she had moved before she met Epstein and that therefore she was in fact older and was living in a house in a gated community which reflected the degree to which her memory had deteriorated with the passage of time due to the Government's delay in prosecuting Petitioner and the interference in her evidence.

4. Jane Doe 84 stated that victims attended therapy in a group ABC Interview with Jane Doe 84 EXHIBIT 84 (see fn 21).

5. ████████████ Testified she was approximately 17 years of age when she met Petitioner (TR 1172) EXHIBIT 98 and testified with specificity that she met Epstein at Petitioners Home in London. (TR 1235:11-13) EXHIBIT 98 The attached property record EXHIBIT 111 shows that Petitioner neither rented nor owned the property until 1996 and renovated it through 1997 when she moved in. ████ was 20 years of age in 1997. The Court ruled that even during COVID she would not permit time for the final witness Kevin Moran to travel from London which required a minimum of 72 hours. The Court expressed her belief that the testimony of Kevin Moran had minimal value EXHIBIT 51. His testimony would have established that ████ did not meet Petitioner or Epstein at Petitioner's home in London in 1994, 1995, 1996 but rather in 1997, at the earliest, when renovation was complete at which point she was 19 or 20 years of age. The judges conclusion deprived the defense the ability to challenge the credibility of the ████ witnesses memory and credibility because she was so adamant as to the details of the circumstances and timings of events which were not possible at the time and the age she stated.

MEMORIES CORRUPTED

Memory of events decades ago was "2 steps removed" per Court (TR 2172:20-24) EXHIBIT 73. The Court held that Timeline was a collateral matter. The Petitioner was repeatedly denied the right to cross examine to impeach memory and yet on sentence the alleged age of the complainants was considered as an aggravating feature and never challenged by Petitioner because of the judge's prohibition on introducing that evidence in cross. (TR 2566:25-25) EXHIBIT 80 (2567: 1-2) EXHIBIT 80 (TR 2584:17-25) EXHIBIT 80, (TR 2585:1-15) EXHIBIT 80

███████████ and Annie Farmer spoke of the "sisterhood" communicating in a "group chat" with every one of the complainants (Transcript TR 1248:2-16, 1249:1-14; 2204-5;lines 10 et seq) EXHIBIT 103 This contributes to transference, poisoning and contamination of memory.

## MALICIOUS PROSECUTION

New evidence reveals the reason why the Petitioner was indicted after having not been named and included in any of the earlier criminal indictments against Epstein or the Palm Beach Police Investigation, simply put it was for expediency and purely political motives following the death of Jeffrey Epstein in the care custody and control of the US Government.

AG Barr admitted that post Epstein's death they were looking for someone to indict for trafficking (Barr Tr. 58:18-19 EXHIBIT 25). The Petitioner was not named in Epstein's first or second indictment, 4 other women were named as co-conspirators but none of the four were ever charged and Petitioner was not named in the PBPD reports which were the earliest statements taken when the memories were fresh. Memory does not improve with the passage of time. The Government could have indicted the 4 named co-conspirators, or any of the 25 men that settled secretly with the lawyers for the plaintiff complainants (see footnote 10) but they did not.

AG Barr stated that the initial investigation was not led by FBI (Barr Tr 55 at pg. 17) EXHIBIT 25. The investigation in other words was not a typical evidence-based, follow the leads type of investigation. Further Petitioner was prosecuted by the Office of Public Corruption at the SDNY which was at the time headed by Maurene Comey, not human trafficking nor sex crimes. EXHIBIT 131 p 2. The Petitioner was not a public figure nor in an elected office.

The fact that investigation was led by others was revealed in "Radar OnLine by the extensive material withheld under client attorney privilege, executive privilege and privacy act – on information and belief the evidence was supplied and created by the Plaintiff's Lawyers (see fn 18) and not disclosed to Petitioner.

In 2008 AUSA Villafana directed Edwards to file the CVRA case, its sole aim to overturn the NPA (Uustal 40.13, EXHIBIT 26). The CVRA became a tactical tool that

allowed the Government to keep investigating Epstein and the co-conspirators exploiting civil litigation and discovery. The ongoing litigation allowed continued press collusion to push a false narrative through friendly journalists like Sharon Churcher and JKB.

The plaintiff's lawyers representing the complainants had approached the SDNY in 2016 in an effort to promote and instigate a criminal prosecution because the SDFL was not happy with the NPA and the plaintiff's lawyers wanted to assist the CVRA case for financial motives. US v Berrios 501 F2d 1207, 1211 (2d Cir 1974) establishes that first one has to prove that similarly situated individuals were not prosecuted. Alameh 341 F3d at 173. There were 4 employee co-conspirators that were not indicted but named in NPA EXHIBIT 81 and referenced in the Indictment of Jeffrey Epstein 19 CRIM 490. The Petitioner was not. New evidence reveals that there were 25 men with which the plaintiff lawyers reached secret settlements – that could equally be considered as co-conspirators ( ILP PART 3 at 12.02  EXHIBIT 19). None of these men have been prosecuted and none has been revealed to Petitioner; she would have called them as witnesses had she known.

D. Analysis

Such delay violated the Due Process Clause of the US Constitution set forth in the Fifth Amendment which provides that no person shall be deprived of life, liberty, or property without due process of law. Lovasco, 431 US at 795 n. 17, U.S. Const. amend. V, cl. 1. The Governments tactical delay to re-litigate a closed matter after the passage of approximately 12 years, constitutes bad faith. US v Marion, 404 US 307 (1971).

Conclusion on Point 8

The inconsistency with the dates and timelines of the witnesses combined with the sensationalist media and the Plaintiff's Lawyers' desire to always make the complainants younger at critical periods reveals the unreliability of the verdict. The Court repeatedly denied Petitioner's requests to call evidence and for access to the material which would have established an accurate timeline and the accurate ages of the complainants at the time of various events and the impossibility of events as they were described at trial. The Court observed that impeachment "is way more metaphysical then [it] could handle at that moment. (Transcript 2569 line 18-19)

Because the Government intentionally delayed indictment for political advantage, the conviction must be vacated or reduced to reflect the violation of the 5th Amendment of the Constitution. US Const amend. V, cl. 4.


POINT NINE

Errors in Sentencing, and fine

A.    Overview

Petitioner's sentence and fine exceeds the lawful maximum and rests on information and factual findings that are unreliable and inaccurate.

B.    Governing Law

A sentence based on materially false assumptions violates due process. Townsend v. Burke, 334 U.S. 736 (1948) Under §2255, "relief is warranted where the sentence was imposed in violation of the Constitution or the laws of the United States."

C.    Factual Background

        The Pre-sentence Report made recommendations based on erroneous information, and attributed uncharged conduct "adopting the governments suggestion" to include additional victims not raised or brought before the Jury (Transcript Sentencing Hearing. at p.16, 10-19). EXHIBIT 52. The court adopted the Pre – sentence report recommendations.

D.    The Court made erroneous guideline calculations for sentencing, and for the fine based on erroneous information

1.     Probation recommended a substantial downward departure basing the calculation on the wrong Guideline namely, the 2004 guideline and not the 2003.(SH. 19:3-5) EXHIBIT 52. The judge adopted the probations calculation of 240 months, admitting she made an error that she had used the 2004 guidelines . (SH. 49:13-25, 50:1-10, 101:4-8) EXHIBIT 52.

The court stated the Petitioner partially owned Epstein's jet ( SH.44:1-9) EXHIBIT 52. There was no testimony that the Petitioner had any ownership interest in Epstein's jet.

2.     Epstein's pilots testified that she had an 'air card', a '1/4 share·' of a separate, unrelated rental plane. There was no evidence that Epstein's pilots flew the unrelated rental plane or that anyone other than the Petitioner flew used the air card to fly on the unrelated rental plane. (Tr 97:8-16). EXHIBIT 74

3.     Two Non-Testifying Witnesses were considered as separate counts of conviction. (SH. 47:8-15) EXHIBIT 52. The witnesses were not named in the indictment and Petitioner argued the record was not adequate to make them separate offense groups (SH.50:16-22) EXHIBIT 52. The Court rejected Petitioner's submissions and sentenced on the two non-testifying witnesses.

4.     The court relied on Melissa's name appearing in Trial Exhibit.52. the address book (SH.51:6-8) EXHIBIT 52. Trial Exhibit 52 is an unreliable document. The government failed to reveal that a Confidential Witness was involved in its production and had access to Trial Exhibit 52 for approximately 3 months prior to alerting the government he had it whilst working at a law firm involved in creating "fake settlements"

to "shake down billionaires" in relation to the required victim's settlements per the NPA in Epstein's criminal case ( See POINT 5)

5.    The court relied on government witness Alessi's testimony to include Non Testifying Witness ("NTW") "Virgina " (Virginia Giuffre) (SH.7:6-9) EXHIBIT 52 . New evidence reveals that "Virginia" visited Alessi prior to trial to get him to testify (see fn 12). Her coercion of Alessi's testimony fatally compromised his testimony making his assertions regarding "Virginia" unreliable. Virginia was an unreliable witness whose new depositions in 2022 reveal that she should not have been considered as a "victim" in Petitioner's sentencing and doing so was unethical. ( Letter of Greene and Aidala) EXHIBIT 132. Giuffre's counsel have sealed these depositions so Petitioner has not seen them.

6.    Petitioner was sentenced for perjury counts stemming from Virginia Guiffre's defamation case that were severed from the indictment and never adjudicated. The perjury charges were added to the indictment through the government agents, Plaintiff's Lawyers, the government misleading 2 judges as to the involvement of the Civil Plaintiff's lawyers. (see fn 9)

7.    The court determined the correct range for the fine under the 2003 Guidelines (SH.49:16-17) EXHIBIT 52

8.    The court made assumptions as to the Petitioners wealth based on assets the Petitioner did not, does not have and never had – namely a bequest (SH.52:4-25, 53:1-23) EXHIBIT 52 which was never realized and is unlikely to be so.

9.    The court calculated the fine under the 2004 Guidelines – (the maximum per count under 2003 $200,000. (SH.49:16-17, 97:10-14)EXHIBIT 52)  the court rejected the contention the defendant could not pay the fine  and made an error – that the maximum fine was under the Guidelines, $250,000 (the amount under 2004 Guidelines ) (SH.97:10-14) EXHIBIT 52

10.    The court recognized her error and failed to correct it. (SH.101:1-12) EXHIBIT 52

11.    Petitioner was sentenced as if she were Epstein. Acosta testified that the range that was considered for Epstein was 168 - 210  months (A.Tr:42:1-2) EXHIBIT 54

12.    Petitioner argued that the court stretched "the elasticity of the record" well beyond 'fair inference' (SH.80:16-17) EXHIBIT 52

Analysis

Enhancements lacking factual support violate US v. Gigante, 94 F. 3d 53 (2 Cir. 1996) Sentence and fines based on non-trial victims exceeds the courts statutory authority. Hughey v. U.S. 495 U.S 411 (1990)

MDC Brooklyn

Petitioner's pre-trial confinement was barbaric[22] and contrary to Treaties to which the US is a signatory. The court found her confinement "'better than typical" (SH.95:2-3), EXHIBIT 52 and that she was "not singled out for harsh treatment" (SH.94:22-24) EXHIBIT 52. By contrast AG Barr testified the confinement was 'quite severe' (Barr.Tr.121:1) EXHIBIT 25. AG Barr testified he was responsible for the conditions of her confinement. EXHIBIT 25

1.      Petitioner was held in solitary confinement through the pendency of the trial proceedings (600 + days)[23].

a)      Petitioner never slept in her assigned bed, not 1 night

b)      Petitioner was searched 7 times a day. Her cell and belongings twice a day (eventhough filmed 24 hours per day).

c)      Petitioner was placed on suicide watch 600+- awaken every 15 minutes – every day and was never found to exhibit suicidal ideations though evaluated by psychological staff everyday. After 2 years found to suffer such severe Vitamin D deficiency that she required medical intervention. (BOP Central File not available to inmate).

d)      Petitioner was abused physically and sexually and filed multiple PREAS complaints (pursuant to the Prison Rape Elimination Acts) against the various offending guards .

e)      Petitioner was forced into psychological interviews daily – all filmed and recorded – at times with 3rd parties present who were not part of psychology and not introduced.

f)      Petitioner's legal calls were recorded; she was unable to meet with counsel because of COVID policy restrictions. Discovery was not given to defendant in a timely manner, was largely unreadable (approximately 35%) and the hardware provided by the Government failed repeatedly. Legal work provided by her attorneys was interfered with – removed, copied and sent to an unknown 3rd party. Notes of Petitioner's lawyers were seized upon departure from MDC Brooklyn.

---

[22] Petitioners counsel repeatedly tried to address concerns of her treatment in MDC Brooklyn to the Court to include trying to summon the Warden to respond to questions (Dkt. 92) EXHIBIT Issues with Legal materials being seized (Dkt 249, 255, 265 ) EXHIBIT 138 , difficulties in communications with her attorneys (Dkt 321) EXHIBIT her lack of sleep because of the 15 minute flash light surveillance (Dkt 257, 282) EXHIBIT 139 delays in receiving her legal material (Dkt 353) EXHIBIT 140

[23] Petitioner requested all records at MDC Brooklyn be retained to include but not limited to camera footage both static and hand held cameras, 15 minute suicide watch books that annotated Petitioner's every move and other relevant information to support Petitioner's statements regarding her detention some of which can also be found in her BOP Central File Records.

Ghislaine Maxwell 02879-509 Petition for Writ of Habeas Corpus                    49
pursuant to 28 U.S.C. § 2255

Counsel filed letters with the Court - and Petitioner filed Administrative Remedies and the serious infractions all recorded but never acted upon by the Government.

Petitioner has been singled out and harshly treated like no other inmate-- her phone calls were leaked to a third party in Brooklyn, her emails leaked in Bryan.

No other similarly situated remand inmates with no criminal history facing similar charges were similarly treated. P Diddy for example was placed in General Population.

Petitioners' treatment was in direct response to Epstein's death at MCC - AG Barr testified he was responsible for setting the terms of Petitioner's detention (EXHIBIT 25)

AG Barr admitted that there was a need to find "someone" to charge- p 58 line 19 Transcript AG Barr 8/18/2025 House Oversight and Government Reform EXHIBIT 25 The Petitioner's treatment was so harsh --and it so deprived her of sleep that her ability to take the stand in her defense was compromised after nearly 2 years of such severe treatment.

Governing Law

The inmate must show that her pre-trial conditions 'amount to punishment" either by an express intention to punish or showing that the conditions are not "reasonably related to a legitimate goal" Bell v. Wolfish, 441 U.S 520, 535, 539, 99 S. Ct. 1861,60 L. Ed. 2d 447 (1979) Confinement at MDC has been found to be a relevant factor in re-sentencing, being confined during COVID and no physical access to counsel an aggravating factor (See U.S v. Rodriquez, 492 F. Supp 3d 306, 311 (SDNY 2020). Petitioner was awakened every 15 minutes, day and night, she was held in solitary confinement, she was sexually assaulted and physically assaulted. Guards would "forget" to feed her. The constant searching, when in the course of more than 2 years no contraband was found could only have been intended to torture and punish. The denial of sleep could only have been intended to torture and punish. The constant physical and sexual abuse could only have been intended to torture and punish. Petitioner in pre-trial confinement was still of good character with no conviction recorded against her.[24]

Analysis

---

[24] https://oig.justice.gov/sites/default/files/2019-12/2019-09-26.pdf;

https://abcnews.go.com/US/federal-probe-ordered-inhumane-conditions-york-lockup/story?id=60908269;
https://theappeal.org/brooklyn-metropolitan-detention-center-
watch/#:~:text="Unconscionable"%20Conditions,and%20mold%20in%20the%20shower."
https://www.prisonlegalnews.org/news/2021/feb/1/justice-department-report-documents-brooklyn-
metropolitan-detention-centers-poor-response-covid-19-
crisis/#:~:text=The%20OIG%20report%20stated%20that,the%20infection%20during%20the%20crisis.&te
xt=As%20a%20digital%20subscriber%20to,this%20and%20other%20premium%20content.solitary

Enhancements lacking factual support violate US v. Gigante, 94 F.3d 53 (2d Cir. 1996) Fines based on non-trial victims exceeds statutory authority. Hughey v. US, 495 U.S. 411 (1990

Conclusion on Point Nine

Petitioner's sentence should be corrected to exclude unsupported enhancements, her harsh and unconstitutional treatment in MDC taken into consideration and credited (including her confinement in solitary confinement for more than 2.5 years), her fine readjusted, and/or the case should be remanded for resentencing.

CONCLUSION

The newly discovered evidence referenced above is such that when taken as a whole it constitutes a miscarriage of justice in that, the Petitioner did not receive a fair trial by independent jurors coming to Court with an open mind. At least three had been prejudiced by their own history of sexual abuse and then injected into deliberations, information that would not have been inadmissible in Court which only served to poison the minds of those jurors who started from neutral.

Further the Plaintiff's Lawyers and the media conducted themselves in an outrageous manner that even the Sheppard v Maxwell[25] Court could not have imagined. If the jury had heard that the prosecution improperly concealed evidence behind the privacy act, client attorney privilege and the executive privilege it would have cast the proceedings in a new light. Petitioner was denied the right to confront the Government on it's investigation and denied the ability to raise the NPA or the Palm Beach investigation and denied subpoena's for the materials held by plaintiff's lawyers who acted as an unlawful arm of the prosecution and that would have revealed the prosecutorial misconduct.

If the jury had heard of the new evidence of the collusion between the plaintiff's lawyers and the Government to conceal evidence and the prosecutorial misconduct they would not have convicted. If the jury had heard that the investigation was not conducted by neutral objective investigators of the FBI but rather investigators for Plaintiff's Lawyers who had a pattern of ignoring and burying exculpatory evidence and witness tampering and had a vested interest in enriching themselves and their practices and clients with windfalls of millions of dollars, they would not have convicted.

For all of the reasons respectfully set forth above the Petitioner asks that this Court orders vacatur of her conviction, an evidentiary hearing, and/or any other such relief as this Court deems appropriate and justice requires.

Respectfully submitted
Ghislaine Maxwell

---

[25] Sheppard v. Maxwell, 384 U.S. 333 (1966)

Ghislaine Maxwell 02879-509 Petition for Writ of Habeas Corpus         51
pursuant to 28 U.S.C. § 2255

CERTIFICATE OF SERVICE

I, Ghislaine Maxwell, hereby certify that on this    16 day of DECEMBER  2025, I caused a true and correct copy of the foregoing PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2255 and all attached exhibits to be served by first-class mail upon:

U.S. Attorney's Office for the Southern District of New York Attn: Criminal Division

One St. Andrew's Plaza New York, NY 10007

/s/ Ghislaine Maxwell Ghislaine Maxwell, Pro Se